**COASTAL INDUSTRIAL WATER AUTHORITY, Appellant,**

v.

**Ben R. REYNOLDS et al., Appellees.**

**No. 16218.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

Dec. 13, 1973.

Rehearing Denied Jan. 10, 1974.

Fred R. Spence, Houston, for appellant.

Andrew J. Lannie, Baytown, for appellees.

PEDEN, Justice.

Water Authority brought this suit to condemn, for use as a canal, the fee title to a 32.35 acre strip of land across a 2,184.38 acre tract owned by the Condemnees. The condemnor complains of the award for damages to the remainder but not of the award for the value of the strip taken.

The land owned by Condemnees is a rectangular tract located about 4½ miles north of Interstate Highway 10. This tract is divided by Cedar Bayou, which separates Harris and Chambers Counties, with 418.22 acres located to the west in Harris County and 1766.16 acres in Chambers County east of the bayou. Mont Belvieu is southeast of the tract.

The judgment awarded Condemnor title to the 32.35 acre strip across the 1766.16 acre tract in Chambers County, leaving 1204.16 acres of it in Chambers County between the canal and Cedar Bayou, and 529.23 acres east of the canal. Hatcheville Rd. connects Mont Belvieu to the 529.23 acre tract east of the canal, but the 1204.16 acres in the center, between Cedar Bayou on the west and the canal on the east, are

now cut off from access except by a .21 acre easement across the canal.

Pipeline easements run across the south side of the entire tract, and a utility easement crosses the central part of the property in a northwest to southeast direction.

The parties stipulated that September 21, 1970 was the date of taking, and the jury found the market value of the 32.35 acre tract on that date to be $35,585. It found the market value of Condemnees' remaining 2151.82 acres to be $2,367,002 immediately prior to severance of the 32.35 acre tract and $2,234,544.40 immediately afterwards, a difference of $132,457.60.

As set out in the Condemnor's pleadings, the judgment reserved to Condemnees, their heirs, successors and assigns forever, a permanent easement containing .21 acres across the 32.35 acre tract for the purpose of providing access from Condemnees' remaining property on the east side of the canal to that on the west side.

The judgment further provided:

"In reserving and excepting the above easement to Defendants herein, their heirs, successors and assigns forever, the Coastal Industrial Water Authority will construct and maintain a bridge across its canal, to be constructed on the above described property as described in Plaintiff's Second Supplemental Petition, at no cost to the abutting property owners so that the Defendants herein, their successors and assigns, together with Coastal Industrial Water Authority will have the right and use of said bridge for the purpose of crossing over said canal."

The bridge described in Condemnor's Second Supplemental Petition was almost completed at the time of trial. It was located near the south boundary of Condemnees' land where they have a road they use in rice farming. Width of only 16 feet is provided for vehicular use.

Both of the real estate appraisers called by the Condemnees and Mr. Charles Osen-

baugh, the only one called by the Condemnor, testified that the property's highest and best use was for investment or speculative purposes for future subdivision development but that it had an interim use for rice farming.

Condemnor's first point of error is that the trial court erred in allowing the Condemnees' appraisal witness, Mr. George Reed, to testify over objection as to his legal interpretation of the easement across the bridge to the remaining property west of the canal, because the witness was not qualified to express a legal opinion that the access across the bridge was limited to the exclusive personal use of the owner of property east of the canal and that the owner's right to use the bridge would not allow for any member of the public, other than such owner, to use the bridge in connection with that ownership, and because the witness' interpretation of the easement is incorrect. Its second point of error is that the trial court erred in failing to strike Mr. Reed's testimony as to the damages to the remainder because it was based in part on his incorrect interpretation of the effect of the easement.

Mr. George Reed was called by Condemnees. He was shown to be qualified as a professional real estate appraiser. He described the property in question and stated that while it is now being farmed for rice, its highest and best use at the time of taking of the strip for the canal was for investment for subdivision purposes either at that time or in the near future. His testimony on direct examination also included:

"Q. Based upon the value of your appraisal of the market value immediately before the taking and your appraisal of the market value immediately after the taking here, have you made a calculation as to the total diminution in value, if any, suffered by the Defendants' tract of land, do you recall, to the 32.35 acres for fee taking?

"A. Yes, Sir.

"Q. What is that?

"A. That figure is $527,705.00.

"Q. Mr. Reed, where do you consider the diminution in value, if any, to the entire tract of land will occur by the reason of the canal fee taking?

"A. The canal fee taking restricts the property, from the standpoint of development, to development on that entire land to the east of that canal as it is today, and apparently a permanent condition and there will be a possibility of developing the land for public purposes to the west of the canal. The fee taking prohibits crossing by the public. It allows only crossing by the owners and by Coastal Industrial Water Authority."

Condemnor objected to that testimony "for the reason that it is based on an incorrect premise. The pleadings in the case give not them, but their 'heirs and assigns' the right to use the bridge and his opinion of market value of the remainder after is therefore based on improper premise, legally binding." The court overruled the objection.

The direct examination of Mr. Reed continued:

"Q. Mr. Reed, as to the rights that the Condemnors are condemning here, what rights do you understand are being condemned as to the canal fee taking itself?

"A. Of course it's a fee taking of all of the rights. However, they turn around and the landowner is given back the right for him to cross it, together with the Coastal Industrial Water Authority, and also for his heirs, assigns and successors as of the date of taking or the date the document was prepared. Mr. Nelson, or the owner or owners, are the only ones who complete that definition. They would then have to assign this right to somebody else. Individually, they can't assign it to the public in general. They would have to assign this right individually or would have to die before the heirs would take over or have

to sell before the successors would take over.

"So, in effect, it is just a right that one person or persons have to use."

The trial court overruled Condemnor's objections that Mr. Reed's opinion as to damages to the remainder was based on an incorrect legal premise and that his opinion was a legal conclusion, stating: "The witness, I presume, is stating the basis on which he made his appraisal. You can have him on cross-examination later to test him on that."

The following testimony was given by Mr. Reed on cross-examination:

"Q. You don't think that any member of the public went to visit Mr. Nelson or to see Mr. Nelson, they would have a right to go across the bridge?

"A. No, they don't.

"Q. This is you legal opinion?

"A. I'm in real estate and I've got to read documents. In fact, part of my work is to seek out legal advice from attorneys and also judge myself what the legal documents pertain to in real estate mean.

"Q. You said no one just Mr. Nelson could use the bridge?

"A. No, you misunderstood me.

"Q. Member of the public?

"A. I said just Mr. Nelson, as long as he leases it, just Mr. Nelson and his assigns. It goes on in the legal document to say heirs, and assigns.

"Q. Any member of the public that wanted to go out and see Mr. Nelson in the back field of the rice farm, you don't feel they would have a right to cross the bridge?

"A. Not according to the document, you certainly don't. It's not a public use.

"Q. This is really one of your biggest bases for damage to the remainder, isn't it, Mr. Reed?

"A. It's part of the consideration, the fact that it isolated 1204.16 acres completely and totally.

"Q. How much of this damage did you assign to the fact nobody but Mr. Nelson could get over that bridge?

"A. That's part of the damage.

"Q. You couldn't isolate it?

"A. Percentage wise, no. It's very important.

"Q. It is very important?

"A. Again, you said just Mr. Nelson. I said Mr. Nelson, his heirs and assigns. This was brought out before.

"Q. I understand that you say the biggest consideration putting all that damage on this, just Mr. Nelson, his assigns and heirs or subservants could not use the bridge or any other member of the public wanted to get back and there was no way they could use it.

"A. They could use it if they had Mr. Nelson's permission.

"Q. Otherwise, you don't feel they could even though . . .

"A. Even though what?

"Q. If anybody went over and bought some of the land?

"A. No, Sir. They have no right to use the bridge.

"Q. Say, I'd like to buy some of the land up in this area here so I could have frontage on the canal, or across the property, or on the canal that adjoins the property. I'd like to buy some of it, and he said, 'all right, we'll arrive at a price—already sold part of it for more than it was worth on the day the Water Authority went through; I'll sell off a portion of it.' I buy it, and I'm there sitting

with it. So, my brother wants to come over and see me. Don't you think he has a right to cross the bridge?

"A. I think your brother is in trouble.

"Q. You think so?

"A. Yes, Sir.

"Q. This is one of your biggest considerations in putting damage to the remainder. You can't separate it and tell us what percentage?

"A. There is no way of measuring percentage wise."

Mr. Reed had testified earlier on direct examination to factors he considered in formulating his opinion of damages to the remainder.

". . . In my opinion, the factors were what I mentioned first. The limitation on the access to that piece of land between the canal and Cedar Bayou. It's limited to the owners, heirs and assigns and to the Coastal Industrial Water Authority. Therefore, it would not be possible to improve that property with a residential subdivision or any subdivision of any type where even the public would be required to cross this easement. I mean, in fee strip.

"In addition to that, the existence of the canal is going to be, as far as crossing the land, in the affect of the berms or the embankment, and will rise, as I understand, six to twelve feet high. This will constitute a barrier from the standpoint of view and as they could build a house or small subdivision up against the barrier, this is never considered good.

"There will be an area near this canal that will not be considered the most desirable area of the property certainly. Also, severing the property to where it would be most difficult to extend any utilities of any kind across over or under this fee strip. It will be impossible to

anticipate that you could put a sewage disposal system for the property and even where you could gain access over across the top, for the purpose of the public using the system having the problem of running the sewage or sewer water and all the utilities, either the expensive project of running under or building a separate facility.

"Therefore, the small piece to the east would have one sewer disposal system. The problem now would be altering the piece of property to the public for sale. This is what I'm charged with and is my responsibility to estimate the market value, what a piece of this property would be to the general public, the buyer would have for whatever reason."

Although Mr. Reed testified at one point that only the land owners and the Water Authority could use the bridge over the easement, during his lengthy examination and cross-examination he corrected this testimony to add to this list the land owners' heirs and assigns. He did state, as noted, that one who bought some of the land from the Condemnees could not use the bridge without the Condemnees' permission and could not permit a guest to use it. This testimony was not a correct interpretation of the easement provision, but it was inconsistent with his other testimony on the matter. A jury may resolve inconsistencies in the testimony of a witness. Varnado v. City of Groves, 329 S.W.2d 100 (Tex.Civ.App.1959, writ ref.n.r.e.).

When these answers were given on cross-examination, appellant's counsel did not move at that time to strike them. A few minutes later the Condemnees rested their case and the appellant's counsel stated:

"Now comes Coastal Industrial Water Authority immediately after Mr. Reed's testimony and again move the Court to strike Mr. Reed's market value of the remainder after and its import as to damages in connection with his value of the remainder before, for the reason that:

"Mr. Reed has based his damages to the remainder and its value of the remainder immediately after on an incorrect legal presumption being the construction of the easement and the rights reserved to the defendants herein, to the effect where Mr. Reed said, 'that no member of the public could cross the bridge in connection with the ownership of the property beyond the bridge to the West of the canal on the 1204.16 acres,' that it is an incorrect legal interpretation of the instrument and Mr. Reed was not qualified to express his legal opinion as to the legal situation of the instrument.

"In making this motion I'll point out to the Court, and for the record, I specifically asked if Mr. Reed could deduct the amount because of this improper legal opinion as to who could use the bridge, and he said he could not.

"For this reason, the Coastal Industrial Water Authority again urges the Court to strike Mr. Reed's testimony as to the value of the remainder after as it compares with the remainder before in its import of his damages to the remainder."

▮ To exactly what testimony of the witness this motion was directed is not clear to us. Mr. Reed had not said that he was giving a legal interpretation or opinion. He had testified at another time that one of the factors he had considered in evaluating the damage to the property for its highest and best use as a future subdivision was the limiting of access across the canal by restricting it to a bridge whose roadway was only 16 feet wide, which is too narrow for acceptance as part of a county road.

We do not find in the record that either side requested any instruction from the trial court to explain the rights of the parties under the easement in question. This was a question of law. White v. Natural Gas Pipeline Co. of America, 444 S.W.2d 298 (Tex.1969).

It is clear that the public is not named among those to have benefit of the easement, and it is difficult to see, under the highest and best use of the 1204.16 acres as an investment for future development, how it could fail to be damaged rather heavily by this limitation of the easement.

The canal will also be constructed just south of the appellees' south property line on the 1204.16 acre tract. This construction will not be on appellees' property, so they are not entitled to damages arising from it, but it is significant that there was testimony indicating development is approaching the subject property from its Mont Belvieu side (southeast) more than from its Houston side (west). Thus the canal on the south and east, Cedar Bayou on the west and lands owned by others on the north will severely limit access to the 1204.16 acre tract.

Further, we will later notice that in the testimony as to value given by appellees' other real estate appraiser, Mr. Gordon Speer, he did not interpret the easement provision and that his testimony as to damages to the remainder was higher than the jury's findings of such damages.

The Texas Supreme Court held in Texas Electric Service Co. v. Campbell, 161 Tex. 77, 336 S.W.2d 742 (1960) that reversible error had been committed by the admission of evidence which gave the erroneous impression that a utility company's 50-foot right-of-way for construction, maintenance and repair purposes across 4,120 acres gave the company and its employees an unrestricted right of entry and use of adjoining land for other purposes and that during the life of the easement the land would be littered with trash from time to time.

After reviewing all the evidence we consider, for the reasons stated, that this case is not controlled by the holding in Texas Electric Service Co. v. Campbell, supra, and that in declining to strike all of Mr. Reed's testimony as to damages to the remainder, the trial court's action did not amount to such a denial of the rights of the Condemnor as would be reasonably calculated to cause and probably did cause an improper judgment in this case.

Condemnor's third point of error is that the trial court erred in allowing Condemnees' appraisal witness, Mr. Gordon Speer, to testify to damages to the remainder over its objection that he failed to specify the basis of his opinion that the remainder had been decreased in value by the taking.

Mr. Speer testified that he had lived all his life in Mont Belvieu in Chambers County. He graduated from Mont Belvieu High School and Rice University. He had maintained a full time office in Mont Belvieu for two years prior to trial, devoting his time primarily to real estate development and sales.

We summarize his testimony concerning his familiarity with the subject property and property in the general vicinity.

He had been familiar with the property in question for about as long as he could remember and had walked it in 1960. He sold approximately four thousand acres in the general market area in the year preceding the date of trial while engaged in real estate sales. He identified the surface features of the property and various highway accesses to it from an exhibit introduced by the Condemnees at the trial. He was active in the development of property in the Cherry Point Addition adjacent to the subject property. While acting as trustee for local investors he had purchased a 367.60 acre tract which had earlier been identified as a comparable sale to the subject property by Condemnor's expert witness, Mr. Osenbaugh, on direct examination. He had sold as agent and retained an interest in a 458 acre tract located about a mile from the subject property. It had been identified by Mr. Reed as a comparable sale to the subject property and was later identified by Mr. Speer as the tract which he resold in 1972 to a group of investors.

Mr. Speer testified that the highest and best use of the subject property was for in-

vestment purposes although its interim use was for rice farming. That the remainder, 2,151.82 acres, had a value of $2,797,366 immediately before the taking and of $2,195,286 immediately afterwards, a difference of $602,080.

His testimony continued:

"Q. At this time I'll ask you to take the pointer and indicate for the benefit of the jury the reasons as to the determination of the value that you assigned to this property.

"A. The estimate is one of the main determining factors. (1) When you cut a piece of property this large perpendicularly, it just diminishes the value of the remaining part of the tract. (2) As I understand, this piece of property has only access to the remainder across one small bridge in this area. Barriers across the property in this manner cut down the visibility of the remainder of the property. Therefore, I feel the tract is diminished a great deal because of the canal. (3) I understand the bank will be nine feet tall or higher and it completely cuts off the visibility in this area. (4) If there were any development in this area or part of the tract, it would be almost impossible to service this much land across this small bridge.

"Q. With reference to access generally, are you speaking from the investor's standpoint?

"A. More or less, the investor's and sales.

"Q. Are you basing your estimate here on the experience that you've had in selling, or property that you have indicated that you sold or your familiarity with this property also?

"A. Right."

■ Condemnor relies on the statement by the court in Tennessee Gas & Transmission Co. v. Zirjacks, 244 S.W.2d 837 (Tex.Civ.App., 1951, writ dism'd, that one claiming damages to land must show the nature of the damage, the effect upon various portions of the tract and the relationship of same to market value; and that a mere conclusion as to market value is insufficient for this purpose. The latter rule, however, applies to a party claiming damages, not his value witness. City of Houston v. McFadden, 420 S.W.2d 811 (Tex.Civ.App.1967, writ ref. n. r. e.).

Moreover, Zirjacks is factually distinguishable from the instant case. More in point is State v. Scarborough, 383 S.W.2d 839 (Tex.Civ.App.—Texarkana 1964, writ ref'd n. r. e.), wherein the court stated:

". . . [I]t is uncontradicted that the value witnesses were well acquainted with the remnants of the land left after the condemned strip was taken. By implication these witnesses knew the condition of the tracts, and their testimony showing a diminution in value related the condition to their opinion of market value. State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, says: '* * * the correct method of adducing evidence as to market value is by witnesses, after suitable qualification, giving their opinion as to the market value of the residue before and after the taking, rather than undertaking to testify to specific items of injury and damage (citing authority).' Here the facts of damage to the residue are in the record and the witnesses are acquainted with such facts. Their testimony translated this damage into a diminished market value.

"What compelling reason can there be for the witness to first detail the 'how' and 'why' of his opinion before expressing his opinion of value? The facts are before the jury . . . The State might, if it chose, have tested the reasonableness of the value witness's conclusions by cross-examination upon the 'how' and 'why' detail."

When Mr. Speer testified, the trial record was replete with maps, plats and exhibits, admitted in evidence by both par-

ties, indicating precisely the nature and extent of the taking. Mr. Speer's qualifications as an expert value witness as to real estate in that vicinity were not challenged. Mr. Wilbur Evans, Project Engineer for Brown & Root, called by Condemnees, had earlier testified that the canal right of way would have an average width of 260 feet and that the canal ditch would be 107 feet wide from the inside top of each levee with a berm or levee height ranging between 6.4 feet to 11 feet above ground level. The physical features of the canal itself constituted some evidence of damages to the remainder when considered in light of the highest and best use ascribed to the property by the value witnesses for both parties.

Condemnor calls attention to the fact that the 418.225 acre tract west of Cedar Bayou was sold two years after the date of taking at an increased market value of $67,421, and says that the 529.23 acres east of the canal could not possibly have been damaged. It argues these tracts should not have been considered in assessing damages to the remainder and even if they could have been considered Mr. Speer's testimony of damages to the entire remainder was not based on the reasonable probability of future development, but merely on speculation that it would be developed.

■ We hold that the record reflects Mr. Speer was qualified to express his opinion as to the damage to the remainder and that the bases he gave for his depreciation of it amply support both the admissibility of his testimony and the jury findings.

Condemnor asserts in its fourth point that the cumulative effect of the errors complained of in its first three points was calculated to cause and probably did cause the jury to render an improper verdict of damages to the remainder in the amount of $132,457.60.

A review of the testimony of the value witnesses set out at length above evidences numerous factors upon which the jury may have relied in reaching its verdict of damages to the remainder.

We think it clear that the jury was authorized to infer from the testimony of Mr. Evans that since the narrow width of the bridge across the canal would preclude its acceptance as part of a county road, the Condemnees' 1204.16 acres west of the canal would be almost isolated as to purposes consistent with its highest and best use. Certainly it was within the province of the jury to consider whatever deleterious effect of the presence of his wide canal and its high embankment might have on the subject property's highest and best use.

■ The jury is at liberty to reach its conclusion by blending all of the evidence admitted before it, aided by its members' own experience and knowledge of the subject of inquiry. Jurors are not compelled to credit all the testimony of any witness or to reject it all. Opinion evidence is not conclusive. A jury may consider and accept or reject opinions or it may find its own opinion from evidence and by utilizing its own experience in matters of common knowledge. Roberts v. State, 350 S.W.2d 388 (Tex.Civ.App.1961, no writ); citing McCarthy v. City of Amarillo, 307 S.W.2d 595 (Tex.Civ.App.1957, no writ history) and Coxson v. Atlanta Life Ins. Co., 142 Tex. 544, 179 S.W.2d 943 (1944).

We overrule the fourth point of error.

Condemnor's fifth and sixth points of error are "no evidence," "insufficient evidence" and "great weight "points attacking the jury's findings of decreased market value to the remainder which amount to $132,457.60. In its seventh point the Condemnor complains that the finding of damages to the remainder is excessive.

Condemnor's primary argument under these points is that the testimony of Condemnees' value witness Reed was insufficient because of the construction he had placed on the easement rights reserved to Condemnees; and because of ambiguities in his methods of depreciating the value of

the 1204.16 acres between the canal and Cedar Bayou.

Mr. Reed testified that he did not consider that either the 418.225 acre tract west of Cedar Bayou or the 529.23 acre tract east of the canal had been damaged by the taking of the strip for the canal but that the 1204.16 acre tract between Cedar Bayou and the canal had a value of $1,487,229 before the taking and a value of $966,703 after the taking, a decrease amounting to $520,526. In response to questioning in detail on cross-examination he testified that the average value per acre of the 1204.16 acre tract just before the taking was $1,235.07 and just after the taking it was $802.80, explaining that some of the tract was encumbered by existing pipe line easements and some by a power company easement, so his average valuations per acre were influenced by his having evaluated those areas at a much lower figure than the others. These average figures would indicate a decrease in value of $520,522. There is a discrepancy of $4 between this amount as compared to his $520,526 figure and a discrepancy of $7,173 when compared to the $527,705 figure he gave in his earlier testimony.

■ Earlier, on direct examination, Mr. Reed had testified "In my opinion, the 1204.16, noted on the plat will diminish in value 5 per cent because it would be a long term investment, somebody willing to gamble and take it, somebody willing to buy some land and run stock up to the property. As it is now, access to that 1204.16 acres, that could be used by the public." This decrease in value would amount to only $74,361.45. We do not understand that the witness has explained this apparent inconsistency in his testimony, but it is well settled that a party is not necessarily bound to a fact which is admitted only by way of opinion. De Winne v. Allen, 154 Tex. 316, 277 S.W.2d 95 (1955), and that a jury may resolve inconsistencies in the testimony of a witness. Varnado v. City of Groves, supra.

Appellant complains that appellees' value witnesses ignored the use of the land for rice farming and testified to no damages to the remainder as rice farming land. We find no merit to this argument. As we have noticed, both sides' value witnesses agreed that the land's highest and best use is for investment purposes, meaning that its value is increasing with growth in the community and will probably continue to increase, but that in the meantime it has value in that it is suitable for continued rice farming.

■ We hold that the evidence we have recited supports the jury's findings. They were well within the range of values assigned to the remainder before and after the taking by the value witnesses as shown by this chart:

| | WHOLE PROPERTY | PART TAKEN | REMAINDER BEFORE | AFTER |
|---|---|---|---|---|
| Nelson (landowner) | $2,730,481.25 | —— | —— | —— |
| Reed | $2,688,184.00 | $43,321.00 | $2,624,863.00 | $2,097,158.00 |
| Speer | —— | $42,055.00 | $2,979,366.00 | $2,195,286.00 |
| Osenbaugh | $2,184,380.00 | $32,350.00 | $2,151,820.00 | $2,367,000.00 |
| Verdict | —— | $35,585.00 | $2,367,002.00 | $2,234,544.00 |

We overrule the appellant's fifth, sixth and seventh points of error.

■ The thrust of the Condemnor's last four points of error is that the trial court erred 1) in sustaining the landowners' special exceptions to the Condemnor's Second Amended Petition (which promised to construct and maintain "a bridge" across its canal but did not describe it) and 2) in

entering judgment that referred to the bridge provisions as follows:

"In reserving and excepting the above easement to Defendants herein, their heirs, successors and assigns forever, the Coastal Industrial Water Authority will construct and maintain a bridge across its canal, to be constructed on the above described property (i. e., the .21 acre easement) AS DESCRIBED IN PLAINTIFF'S SECOND SUPPLE-MENTAL PETITION at no cost to the abutting property owners so that the defendants herein, their successors and assigns, together with Coastal Industrial Water Authority, will have the right and use of said bridge for the purpose of crossing said canal." (emphasis added)

Appellant's pleadings initially sought to condemn in fee the 32.35 acre strip for use as a canal, thus depriving appellees of internal access across it to their remaining 1204.16 acre tract in Chambers County. Later, Condemnor filed its Second Amended Statement which reserved unto Condemnees, their heirs and assigns forever and to Condemnor a .21 acre easement across the 32.35 acre tract, and, provided:

"In reserving and excepting the above easement to Defendants herein, their heirs, successors and assigns forever; the Coastal Industrial Water Authority will construct and maintain a bridge across its canal, to be constructed on the above described property, at no cost to the abutting property owners so that the Defendants herein, their successors and assigns, together with Coastal Industrial Water Authority will have the right and use of said bridge for the purpose of crossing over said canal."

The trial court struck this pleading, sustaining Condemnees' special exceptions urging that it failed to set forth in detail the nature of the improvements to be constructed so as to allow Condemnees to adequately show the measure of damages to the remainder of their property. Although the Condemnor complains under these points of the adverse pre-trial rulings of

the trial court, it did file its Second Supplemental Petition, which provides:

### I.

"In reserving and excepting the easement area to Defendants herein, their heirs, successors and assigns forever, the Coastal Industrial Water Authority will construct and maintain a bridge across its canal to be constructed on the .21 acre tract of land as described in Plaintiff's Second Amended Statement at no cost to the abutting property owners so that the Defendants herein, their successors and assigns, together with Coastal Industrial Water Authority will have the right and use of said bridge for the purpose of crossing over said canal.

### II.

"In this connection Plaintiff would further show that the type of bridge being constructed is a concrete type bridge which is designed to comply with the load standard criteria as set forth by the American Association of State Highway Officials and in accordance with good engineering practices. The bridge will have aluminum tubing guard rails on each side with an overall width of twenty-two (22) feet between the guard rails. The road surface of the bridge will be sixteen (16) feet wide, and will be an asphalt concrete surface. There will also be a concrete curb on each side of the road surface, each of which will be three (3) feet in width. The bridge is being constructed as part of the canal project, and is one of the uses to which the property being acquired in the proceeding will be put."

The trial court did not err in these pretrial rulings. In Texas Power & Light Co. v. Cole, 158 Tex. 495, 313 S.W.2d 524 (1958), the Texas Supreme Court cited with approval the following passage from Union Electric Company v. Levin, Mo. App., St. Louis, 304 S.W.2d 478, 483:

" . . . That the proper time and method of reducing the rights sought in

a condemnation suit by the condemnor would be at the trial of the issue of damages before a jury, and by way of amendment to the petition, was held in Shell Pipe Line Corporation v. Woolfolk, 331 Mo. 410, 53 S.W.2d 917, 918, wherein the Court said that the condemner may appropriate less than the full rights available under the law, and if he does, that fact is a proper element to consider on this issue of damages; that his purpose to exercise less than his full rights *should appear within a reasonable certainty* 'in the petition or be brought in the way of amendment thereto.' In that case the condemner sought to establish a reduction of the appropriation by mere proof that the condemner did not and would not fence in right-of-way. This the Court held was not sufficient, but such reduced easement should have been by way of amendment to the petition." (emphasis added)

More recently, our Supreme Court in White v. Natural Gas Pipeline Company of America, 444 S.W.2d 298 (Tex.1969), speaking through Justice McGee, pointed out that mere promises of future performance made by the condemnor in its pleadings are invalid and would defeat the landowner's right to recover in one condemnation proceeding for all damaging causes that affect the value of the strip condemned and the damages that tend to depreciate the value of the remainder, adding at page 301 of the opinion:

"The landowner is entitled to compensation in money at the time of taking for the difference in market value of the easement strip and remainder before and after taking. The landowner is not burdened with the delay and expense of future lawsuits, Tex.Const. Art. 1, Sec. 17, Vernon's Ann.St.; Glade v. Dietert, 156 Tex. 382, 295 S.W.2d 642 (1956); City of La Grange v. Pieratt, 142 Tex. 23, 175 S.W.2d 243 (1943); State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, 979 (Com.App.1936); See also Rayburn,

Texas Laws of Condemnation, page 253, Sec. 369."

We conclude that the ends of justice and fairness are best served by the Condemnor's having included the detailed plans and specifications of the bridge in its pleadings and by the trial court's incorporation of them by reference in the judgment. It was the Condemnor who had freedom of choice in reducing damages by deciding how much access, if any, the landowners were to have to their tract across the canal.

The Condemnor's last four points of error are overruled.

Affirmed.