TEXAS ELECTRIC SERVICE
COMPANY, Appellant,

v.

V. D. WHEELER et al., Appellees.

No. 17721.

Court of Civil Appeals of Texas,
Fort Worth.

June 4, 1976.

Rehearing Denied July 1, 1976.

Cantey, Hanger, Gooch, Cravens & Munn, Jack C. Wessler and S. G. Johndroe III, Fort Worth, Chandler & Chandler, and Joseph A. Chandler, Stephenville, for appellant.

McMillan & Lewellen, and C. O. McMillan, Stephenville, Dixon & Petrovich, and Jimmie C. Dixon, Granbury, for appellees.

## OPINION

SPURLOCK, Justice.

Appellant, Texas Electric Service Company, hereinafter referred to as TESCO, or condemnor, instituted a statutory condemnation proceeding before the County Judge of Hood County, Texas, against appellees, V. D. Wheeler and wife, Zelma Wheeler, and David Wheeler, their son and tenant, a part time farmer, hereinafter referred to as owners, Wheelers, or condemnees, for the condemnation of a right-of-way across the land owned by Mr. Wheeler and wife. After due proceedings were had before special commissioners the Wheelers appealed to the District Court of Hood County, Texas, where said case was tried before a jury. TESCO appeals only from that part of the judgment awarding damages to the "remainder" of the property. The appeal is predicated upon "no evidence" and "insufficient evidence" points concerning testimony in support of the jury's findings.

We affirm.

TESCO is a public utility operating in north central, east, and west Texas, and at the time of trial was engaged in the construction of the first nuclear-power generating plant to be built in Texas. The plant is located in both Hood and Somervell counties, southwest of Fort Worth. On December 18, 1974, TESCO acquired a permanent easement of a strip 240' wide across the owners' land for the purpose of constructing and using the land for any purpose for which it was needed in connection with the construction of electric transmission lines and two 48" water lines and the use of the easement thereafter. In addition thereto they acquired a 50' strip adjoining the easement in the nature of a temporary easement to be used during the construction of the electric and water lines.

The tract of land involved consisted of 316.239 acres. The permanent easement consisted of 16.972 acres and the temporary easement consisted of 3.539 acres, leaving a remainder of 295.728 acres.

In accordance with the stipulation of the parties the jury was instructed that the easement was acquired on December 18, 1974. The jury was carefully instructed concerning the nature of the easement and the rights acquired by TESCO, including the right to repair, inspect, control, remove obstructions therefrom, and other rights. They were given a correct definition of "market value". TESCO did not object to any of the court's charges or instructions contained therein.

In summary form the jury found: (1) that the value of the land on which the permanent easement was sought immediately before the taking was $1,100.00 per acre, (2) the value of the same land immediately after the taking was $50.00 per acre, (3) the value of the remainder of the land immediately before the taking was $1,100.00 per acre, (4) its value after its taking was $650.00 per acre, and (5) the damage suffered by reason of the taking of the temporary easement was $500.00.

TESCO does not question the jury's finding that the value of the land taken for the permanent easement was $1,100.00 per acre before the taking, its value thereafter, nor the damages found because of the taking of the temporary easement. The controversy stems from the jury's findings of diminution of the value of the residue.

TESCO, by its point of error No. 1, asserts the trial court erred in rendering judgment for the owners because there was "no evidence" to support the jury's answer to Special Issue No. 3 that the remainder of the land not within the easement had a value of $1,100.00 per acre before the taking.

By its point of error No. 3 it assigns an "insufficient evidence" point to the jury's answer to the above issue.

By its points of error Nos. 2 and 4 TESCO assigns as its points of error that there is "no evidence" and "insufficient evidence" to support the jury's findings of the value of the remainder before and after the taking.

■ We first direct our attention to the "no evidence" points. In passing on these points we are required to view the evidence in the light most favorable to the jury's findings and disregard all evidence which is contrary thereto. *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

■ In determining whether the evidence is "insufficient" to support the jury's findings, the reviewing court must review all the evidence. *State v. Haire,* 334 S.W.2d 488 (Tex.Civ.App., Austin, 1960, ref., n. r. e.).

Maurice Wendt, TESCO's representative during the trial, being their Engineering Manager in charge of all the design of construction of all transmission lines for the company, was called as an adverse witness. He testified that the land was being taken for the purpose of transmitting electricity and water across the property in connection with TESCO's construction and operation of its first nuclear power plant which was being built within a distance of a few miles from the land in question. This plant would generate 22,000 million watts. The company would construct steel poles on the easement 105′ tall, electricity would be conducted through aluminum wire 1.1″ in diameter or 3″ in circumference. The wires would come no closer than 26½′ from the surface of the land. The steel poles would have three wires which would conduct 345,-000 volts and would have shield wires above them. Condemnees' land was 5 miles from Lake Granbury and 3 miles from Squaw Creek Lake. There would be 3100′ of wire crossing the owners' property which would weigh one pound per foot.

The second row of poles consisted of wooden poles with H-frames conducting 138,000 volts through three lines with shield wires above them.

It was shown that this nuclear plant would supply some electricity for metropolitan Dallas-Fort Worth, a portion of east Texas, a portion of west Texas, and as far south as Waco, Texas.

Water would be transported by pipeline from Lake Granbury across owners' property into Squaw Creek and then to the nuclear plant where it will be used in the generating process. It is then pumped into a small lake near the plant and transported by another pipeline across the owners' property to Lake Granbury where the cycle starts again.

V. D. Wheeler, one of the owners of the land, testified that he and his family had lived on the land involved for the past 14 years. He bought this property before Lake Granbury was built and since then the land had increased greatly in value because of the influx of people from the metropolitan areas seeking to avoid congestion and to buy small tracts of land on which to build homes and reside. The property is ½ mile from Mitchell Bend in the region below Lake Granbury dam. It is near land that has been subdivided, such as Indian Harbor and other subdivisions, the highest and best use of the land when he bought it was for irrigated farming but at the time of the taking its highest and best use was for subdivision purposes.

A gas pipeline crosses the land from the NW to SE. TESCO's easement would cross SW to NE, creating an "X". This would "kill" about 100 acres of land in that particular area for the purpose of cutting it into small acres. Wheeler testified that the transmission poles and wires were unsightly and would depreciate the market value of

the remainder of the property. He had planned to subdivide his farm before the taking. He was familiar with the market value of the land in the area and was aware of the fact that the nearby Williams tract of land, a comparable tract, had recently been sold on the open market for $1,500.00 per acre. He had been pricing land and knew the market value of his property. He testified that the market value of the remainder of his property was $1,500.00 per acre prior to the taking and $500.00 per acre after the taking.

David Wheeler, son of the owner and tenant on the farm, testified that land in the area was being subdivided into small tracts such as the Brazos River Acres and the River Community, just east of the owners' property, there were two gas lines crossing the property underground and buried about 7' deep, the owners had made plats and rough sketches on how they had planned to subdivide the property, they had managed to work around the gas lines, and that the TESCO easement destroyed condemnees' land for subdivision purposes.

Thomas B. King, a licensed surveyor, was in the process of preparing a county-wide ownership map and had completed the part of the map that included the Wheeler property. He had subdivided an 800 acre tract in the Mitchell Bend area. He enumerated numerous tracts that had been subdivided into lots or tracts of 10–15 acres. He had discussed with the owners the possibility of subdividing their land. He had prepared a plat showing a proposed subdivision of the Wheeler property, working around the existing gas pipeline easement. This plat was placed in evidence as defendant's Exhibit No. 4. It was admitted for the limited purpose of showing that the land was adaptable for land subdivision.

Vernon Thomas testified that he is a licensed real estate broker, has been in the appraisal business for 15–16 years, was appraiser for the American Appraisal Company of Milwaukee and was a staff appraiser for the Texas Highway Department, had made appraisals all over Central and West Texas, as well as in New Mexico, Oklahoma, Ohio, Wisconsin, Georgia, Florida, and other states, and had done appraisals for the U. S. Corps of Engineers. He testified that the highest and best use of the property involved was for small tract developments such as small acreage and ranchette-type tracts, it was a growing area and there had been 21,000 property transfers during the last 3–4 years. He had appraised the property in question and used a comparable sales approach in arriving at his opinion concerning the fair market value. His five comparable sales are as follows:

(1) Hidalgo to Knipe: a 1973 sale of 72 acres for $1,000.00 per acre;

(2) Peters to Blaylock: a 1973 sale of 65 acres for $700.00 per acre;

(3) Wallace to Goldsmith: a 1972 sale of 50 acres for $947.00 per acre;

(4) Williams to Hyde: a 1974 sale of 30 acres for $1,500.00 per acre;

(5) Ballard to Pearson: a 1973 sale of 245 acres for $1,000.00 per acre.

He was of the opinion that the fair market value of the remainder of condemnees' property immediately before the taking was $1,000.00 per acre and $400.00 per acre thereafter. Its highest and best use would change from property desirable for subdivision purposes to that of peanut farming. The easement would restrict the use of the land and adversely affect its marketability.

He further testified that the electricity conducted through the transmission lines would interfere with TV and radio reception and would distort TV pictures.

There was further testimony from the owners that this property had 2 water wells and 4 ponds located on it. One of the wells produced 400 gallons per minute and was 500' deep. It was used for irrigating 100 acres of peanuts and 75 acres of coastal bermuda grass. The irrigation water was carried by aluminum pipes from the well to the irrigated areas. Volume guns were used that distributed water 330' horizontally and 45' high. The pipe was in 30' sections. There was danger that water or spray could come in contact with high voltage lines and thus conduct electricity

through the water into the aluminum pipes and create a hazardous condition. It would interfere with the irrigation process. Prospective buyers would not pay the same sum of money for land containing unsightly high voltage electric wires across it when they could go across the farm-market road and buy land without the unsightly and dangerous towers for the same amount. These wires depreciated the value of the land. Various maps, charts and diagrams of this property and the adjoining area were admitted into evidence.

Jim Daniels, an appraiser for TESCO, agreed that before the taking the highest and best use of the Wheeler land was for small acre development. He testified that the value of the residue before the taking was $850.00 per acre, and $850.00 per acre after the taking. On cross-examination he admitted that some of the sales he had used as comparables were not irrigated or cultivated land and some had no irrigation available and that he had made a "windshield" appraisal of another comparable tract.

The thrust of TESCO's claimed error is that the owners failed to prove the damage to the remainder because they failed to show the nature of the damage, its effects on the various portions of the tract and the relationship of the same to market value.

■ The above rule applies to a party claiming damages but not to the testimony of expert value witnesses. *Coastal Industrial Water Authority v. Reynolds*, 503 S.W.2d 593 (Tex.Civ.App., Houston, 1st Dist., 1973, ref., n. r. e.); *City of Houston v. McFadden*, 420 S.W.2d 811 (Tex.Civ.App., Houston, 14th Dist., 1967, ref., n. r. e.); *State v. Holland*, 453 S.W.2d 871 (Tex.Civ. App., Tyler, 1970, no writ hist.); *State v. Scarborough*, 383 S.W.2d 839 (Tex.Civ.App., Texarkana, 1964, ref., n. r. e.).

■ It is our opinion that the owners' testimony constituted admissible testimony and testimony of probative value concerning market value and met the requirements of the above test which is stated in *Tennessee Gas & Transmission Co. v. Zirjacks*, 244 S.W.2d 837 (Tex.Civ.App., San Antonio, 1951, writ dism.).

■ In any event such error, if any, is harmless because an analysis of the testimony shows that the jury awarded less damages than the damages testified to by the owners' expert witness.

The owners, in testifying to the before and after value, testified that the value before as being $1,500.00 and the value after as being only $500.00, being $1,000.00 per acre diminution in value. The owners' expert, Vernon Thomas, testified the value before was $1,000.00 and the value after was only $400.00, being $600.00 per acre diminution in value. The jury found $1,100.00 before and $650.00 after, representing a $450.00 per acre diminution in value. This is $150.00 per acre diminution in value less than that testified to by the owners' expert witness. In addition thereto the jury found the fair market value before the taking at $1,100.00, which is $400.00 less than the comparable sale of Williams to Hyde, testified to by the owners' expert witness.

TESCO relies upon the following authorities to sustain its position: *Tennessee Gas & Transmission Co. v. Zirjacks*, supra; *City of Cedar Hill v. Wheeler*, 326 S.W.2d 236 (Tex. Civ.App., Dallas, 1959, ref., n. r. e.); *Natural Gas Pipeline Co. of America v. Mitchell*, 440 S.W.2d 415 (Tex.Civ.App., Beaumont, 1969, ref., n. r. e.); *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194 (Tex.Com.App., 1936); *Texas Electric Service Company v. Vest*, 310 S.W.2d 733 (Tex.Civ.App., El Paso, 1958, ref., n. r. e.); *Texas Electric Service Company v. Yater*, 494 S.W.2d 271 (Tex.Civ.App., El Paso, 1973, ref., n. r. e.); *Texas Electric Service Company v. Campbell*, 161 Tex. 77, 336 S.W.2d 742 (1960).

In the case of *Texas Electric Service Company v. Yater*, supra, cited by TESCO, that court found that the following testimony, referring to the construction of electric lines across the owner's property, was adequate to support the opinion of appellee's witness as to the damage to the remainder when the property is considered as adaptable to rural homesites. That court stated:

"This support is in the testimony that the towers and cables are unsightly and would

hurt the general appearance of the land; that radio and television reception would be adversely affected, that prospective purchasers would be frightened that their children might be hurt playing near the towers and the existence of a general fear in homeowners from lightning and of being near the lines during storms. . . . The cases which distinguish the *Zirjacks* doctrine are applicable here. *Texas Power & Light Company v. Trinity Valley Ranch Company*, 395 S.W.2d 866 (Tex.Civ.App.-Dallas 1965, no writ); *Texas Electric Service Company v. Etheredge*, 324 S.W.2d 322 (Tex.Civ.App.-Eastland 1959, no writ)."

The cases cited by TESCO are clearly distinguishable from the facts in this case. These cases are analyzed and distinguished in *Southwestern Bell Telephone Company v. Griffin*, 429 S.W.2d 576 (Tex.Civ.App., Texarkana, 1968, no writ hist.) and *State v. Scarborough*, supra.

We will not unduly lengthen this opinion by again analyzing these cases cited by TESCO and showing why they are distinguishable from the case before us because this analysis is so ably made in the two cases cited above.

■ The record reflects there is evidence of probative value supporting the jury's findings concerning damage to the remainder. TESCO's "no evidence points" are overruled.

Here the facts of damage to the residue are in the record and the witnesses are acquainted with such facts. Their testimony translated this damage into a diminished market value. The maps, plats, and exhibits admitted into evidence aided the jury in their understanding of the factors of diminished market value of the residue.

■ Jurors are not compelled to credit all the testimony of any witness or to reject it all. Opinion evidence is not conclusive. The jury is at liberty to reach its conclusion by blending all the evidence admitted before it, aided by its members' own experience and knowledge of the subject of inquiry. A jury may consider and accept or reject opinions or it may find its own opin-

ion from evidence and by utilizing its own experience in matters of common knowledge. *Coastal Industrial Water Authority v. Reynolds*, supra; *Roberts v. State*, 350 S.W.2d 388 (Tex.Civ.App., Dallas, 1961, no writ hist.); *McCarthy v. City of Amarillo*, 307 S.W.2d 595 (Tex.Civ.App., Austin, 1957, no writ hist.); *Coxson v. Atlanta Life Ins. Co.*, 142 Tex. 544, 179 S.W.2d 943 (1944); *State v. Haire*, supra.

We hold that the evidence is sufficient to support the jury's findings concerning the before and after value of the residue.

These points are overruled.

Judgment is affirmed.