**RAMCO OIL & GAS LTD. and Ramco Energy PLC, Appellants/Cross–Appellees,**

v.

**ANGLO–DUTCH (TENGE) L.L.C. and Anglo–Dutch Petroleum International, Inc., Appellees/Cross–Appellants.**

No. 14–04–00433–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 19, 2006.

Christopher M. Odell, Michael K. Swan, Houston, for appellants/cross-appellees.

Jett Williams, III, John L. McConn, John O'Quinn, Neil C. McCabe, Houston, for appellees/cross-appellants.

Panel consists of Chief Justice HEDGES and Justices FOWLER and FROST.

## SUBSTITUTE OPINION[1]

KEM THOMPSON FROST, Justice.

This case arises out of a business dispute over interests in a foreign oil and gas field. After a lengthy trial involving complicated facts and extensive expert testimony, the trial court rendered judgment on the jury's verdict, awarding plaintiffs/appellees/cross-appellants $6.4 million in lost profits, plus attorney's fees and interest, based on their breach-of-contract claims against defendants/appellants/cross-appellees. The main issue on appeal is whether the evidence proves with reasonable certainty the profits appellees claim to have lost as a result of appellants' breaches of contract. We conclude that it does not. We also conclude that the trial court correctly granted summary judgment as to appellees' claims for breach of fiduciary duty, misappropriation, and misappropriation of trade secrets. Accordingly, we reverse the trial court's judgment and render judgment that appellees take nothing against appellants.

[1] We overrule the motion for rehearing filed by appellees/cross-appellants Anglo–Dutch (Tenge) L.L.C. and Anglo–Dutch Petroleum International, Inc. We withdraw the opinion issued in this case on June 6, 2006, and we issue this opinion in its place.

## I. OVERVIEW

Scott Van Dyke repeatedly tried without success to realize his "dream and business plan" by purchasing the equity of a company with development rights in a potentially lucrative oil and gas field in Kazakhstan so that he could try to profitably develop this field. After learning that another company had acquired these development rights, Van Dyke concluded that the purchaser acquired these rights by using confidential information obtained in violation of confidentiality agreements. Van Dyke's companies filed suit against the companies he believed had breached these agreements and misappropriated confidential information and trade secrets.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1992, Van Dyke and appellee/cross-appellant Anglo–Dutch Petroleum International, Inc. (hereinafter "AD International"), a Texas corporation in which he was a principal, became involved in a group of companies that sought to identify, evaluate, and determine the feasibility of oil and gas opportunities in the former Soviet Union. Sugarland Oil Company, a Delaware corporation, was also a member of this group. The group purchased geological and geophysical data on a field in Kazakhstan known as the Tenge Field. The Soviet Union had produced gas from shallow horizons in the Tenge Field, and this data showed potential oil horizons beneath the gas.

After deciding that the possibilities in the Tenge Field were worth pursuing, appellee/cross-appellant Anglo–Dutch (Tenge) L.L.C. (hereinafter "AD Tenge"), a company in which Van Dyke owned a ninety-percent interest, formed a Delaware limited liability company named Tenge Development L.L.C. (hereinafter "Tenge Development"). Sugarland (Kazakhtenge) L.L.C. (hereinafter "Sugarland"), a Delaware company, also owned an interest in Tenge Development.[2] Tenge Development, in turn, was a member[3] of Anglo–Dutch (Kazakhtenge) L.L.C. (hereinafter "Kazakhtenge"), a Texas limited liability company. Later, N.I.R. Tenge L.P. (hereinafter the "Israeli Company"), an Israeli limited partnership, and Overseas Petroleum and Investment Corporation (hereinafter the "Taiwanese Company"), a Panamanian corporation affiliated with the government of Taiwan, both provided capital and became members of Kazakhtenge. At all material times, Tenge Development served as the administrative member of Kazakhtenge. Although Van Dyke's company AD Tenge was the administrative member of Tenge Development and thus effectively the administrative member of Kazakhtenge until May 1996, neither Van Dyke nor any of his companies owned or controlled a majority interest in Tenge Development or Kazakhtenge at any material time. Lacking this ownership and control, Van Dyke and his companies, on various occasions, attempted unsuccessfully to acquire all of the interests in Tenge Development and Kazakhtenge.

In November 1993, Kazakhtenge and Mangistaumunaygaz Production Association (hereinafter the "Gas Production Association"), a Kazakhstani association affiliated with the Kazakhstan government, entered into a Foundation Agreement regarding the creation of the Tenge Joint Enterprise (the "Joint Enterprise"), a Kazakhstani joint enterprise. Under this Foundation Agreement, which had a term

---

**2.** The other members of Tenge Development are Petfintraco S.A., a Liechtenstein company, and Kazakh Exploration, Ltd., a Texas limited partnership.

**3.** Because Kazakhtenge is a limited liability company, those holding ownership interests are called members.

of twenty-five years, each party owned a fifty-percent interest. The following diagram shows the ownership interests in the Joint Enterprise as well as Kazakhtenge's relationship to the various entities *vis-à-vis* the matters in dispute: [4]

The purpose of the Joint Enterprise was to develop the Tenge Field. The Foundation Agreement and the Charter creating the Joint Enterprise allowed the Joint Enterprise to develop and sell hydrocarbons produced from the Tenge Field.

In May 1997, appellant/cross-appellee Ramco Energy PLC (hereinafter "Ramco Energy"), a Scottish company, signed a confidentiality agreement with Anglo–Dutch (Neftenge) L.L.C. (hereinafter "AD Neftenge") and examined the possibility of becoming involved in the development of the Tenge Field. In June 1997, Ramco Energy decided not to pursue this matter.

Three months later, in August 1997, appellant/cross-appellee Ramco Oil & Gas, Ltd. (hereinafter "Ramco Oil"), a Scottish company, learned that Halliburton Energy Services, Inc. (hereinafter "Halliburton") was reviewing the Tenge Field prospect. Having worked with Halliburton in developing other opportunities in Central Asia, Ramco Oil decided to examine the possibility of becoming involved in the development of the Tenge Field with Halliburton.

4. As explained below, at all material times, AD Neftenge held its interest in Kazakhtenge subject to a constructive trust in favor of Tenge Development, which exercises all of AD Neftenge's rights as a member in Kazakhtenge.

Ramco Oil and Halliburton signed an agreement delineating the terms of their relationship.

On November 26, 1997, Ramco Oil and Halliburton entered into a Letter of Intent with AD Tenge and Anglo–Dutch (Jersey) Limited (hereinafter "AD Jersey"),[5] a Channel Islands company, detailing, among other things, an approach to purchasing interests in Tenge Development and Kazakhtenge. The Letter of Intent was subject to many conditions, including approvals of executive management and, if necessary, Ramco Oil's and Halliburton's boards of directors. The Letter of Intent incorporated the terms of the May 1997 confidentiality agreement signed by Ramco Energy and stated that the terms of this agreement shall apply *mutatis mutandis* ("all necessary changes having been made"), as if Ramco Oil had entered into the same agreement with AD Tenge.

Pursuing development of the Tenge Field necessarily would require interface and dealings with the government of Kazakhstan. To obtain expertise and assistance in this regard, Ramco Oil and Halliburton retained as a consultant Golden Eagle Partners ("Golden Eagle"), which had experience in communications and relations with the Kazakhstan government. For business reasons unrelated to the Tenge Field, Halliburton formally withdrew from the Letter of Intent in July 1998. Ramco Oil withdrew as well in November 1998.

AD Tenge and AD International (hereinafter collectively referred to as "Plaintiffs") and Van Dyke continued to seek to purchase the interests of the Tenge Development and Kazakhtenge members not affiliated with Plaintiffs. Golden Eagle and

Central Asia Industrial Investments, N.V. (hereinafter "Central Asia"),[6] a Netherlands Antilles company, also negotiated with the Tenge Development and Kazakhtenge members. On March 8, 2000, Kazakhtenge entered into a purchase agreement with Central Asia, under which it agreed to sell Central Asia all of the shares in a company to which Kazakhtenge would transfer all of its interest in the Joint Enterprise. Central Asia paid $2 million in cash at the closing of this purchase and agreed to future payments conditioned on future production.

Plaintiffs filed this suit against Halliburton, Ramco Energy, Ramco Oil, and others, alleging breach of contract and various torts. Plaintiffs claimed that, in breach of their obligations to keep the information about the Tenge Field confidential, Halliburton, Ramco Energy, and Ramco Oil disclosed confidential information concerning the Tenge Field to Golden Eagle, which Golden Eagle and Central Asia then used for their own benefit. Plaintiffs later nonsuited some of their tort claims, and the trial court granted two motions for summary judgment filed by Ramco Energy and Ramco Oil (hereinafter the "Ramco Parties"), dismissing all Plaintiffs' remaining tort claims against the Ramco Parties. Plaintiffs went to trial on their breach-of-contract claims against Halliburton, Ramco Energy, and Ramco Oil. Plaintiffs asserted that these defendants breached their contractual confidentiality obligations, allegedly resulting in Central Asia's acquisition of Kazakhtenge's interest in the Joint Enterprise. Plaintiffs claimed that, but for these breaches, they would have purchased the Kazakhtenge members' interest, developed the Tenge Field, and earned $640

---

**5.** AD Jersey is another company owned by Van Dyke.

**6.** Although the parties often refer to this entity as "Central Asian," we use the name shown

in the Purchase Agreement between Central Asia and Kazakhtenge that was in evidence at trial.

million in profits by 2018, the end of their agreement with the Gas Production Association.

After a trial lasting more than six weeks,[7] the jury rendered its verdict, awarding Plaintiffs $64 million in lost profits for Halliburton's breach of its confidentiality agreement and $6.4 million in lost profits for the Ramco Parties' breaches of their confidentiality agreements. The jury also determined that Halliburton and Ramco[8] were partners regarding the Tenge Field project. The Ramco Parties filed a motion for judgment notwithstanding the verdict, and the trial court denied their motion except as to the jury's partnership finding, which it set aside. Otherwise, the trial court rendered judgment on the jury's verdict, awarding Plaintiffs $6.4 million in lost profits on their contract claims against the Ramco Parties, as well as attorney's fees, prejudgment and postjudgment interest, and court costs.[9] The Ramco Parties subsequently filed this appeal. Plaintiffs filed a cross-appeal, challenging, among other things, the trial court's summary judgment in favor of the Ramco Parties as to Plaintiffs' claims for breach of fiduciary duty, misappropriation, and misappropriation of trade secrets.

## III. ISSUES PRESENTED

The Ramco Parties assert the following issues on appeal:

(1) Did the trial court err in admitting the testimony of Plaintiffs' experts George Schaefer and John Brickhill?

(2) Is there evidence proving with reasonable certainty Plaintiffs' lost profits?

(3) As to Ramco Energy's liability, can Plaintiffs enforce the May 1997 confidentiality agreement between Ramco Energy and AD Neftenge?

(4) Did the trial court reversibly err in charging the jury on the Ramco Parties' liability?

(5) Is the evidence legally and factually sufficient to support the jury's liability findings against the Ramco Parties?

(6) Are the Ramco Parties liable for attorney's fees?

In their cross-appeal, Plaintiffs assert the following issues:

(1) Did the trial court err in granting judgment notwithstanding the verdict on the partnership issue?

(2) Did the trial court err in granting summary judgment on the Plaintiffs' claims for breach of fiduciary duty, misappropriation, and misappropriation of trade secrets?

(3) Did the trial court err in denying postjudgment interest on attorney's fees?

(4) Did the trial court err in denying prejudgment interest on future damages?

7. The reporter's record of the trial proceedings consists of 52 volumes, containing more than 7,000 pages, and the clerk's record exceeds 9,300 pages. The trial court admitted more than 560 exhibits into evidence. In addition to their original briefing, the parties have filed extensive supplemental briefs, as well as a number of post-submission motions.

8. The jury question on partnership referred simply to "Ramco." This term was not defined in the charge. In many places in the record and in the briefs reference is made to

"Ramco," and it is often unclear if this means both Ramco defendants, only one, or an affiliated Ramco entity. In this opinion, we refer to both Ramco defendants as the "Ramco Parties." If the record being described says "Ramco" and it is not clear what is meant, then we, too, will use only "Ramco."

9. While the trial court still had plenary power, Plaintiffs and Halliburton settled all claims between them, and the trial court vacated judgment on all of Plaintiffs' claims against Halliburton.

(5) Was the trial court's use of a five percent prejudgment and postjudgment interest rate based on an invalid statute?

## IV. ANALYSIS

### A. Plaintiffs' Proof of Lost Profits as Damages on Their Contract Claims

The main issue on appeal arises out of Plaintiffs' contract claims. In construing contracts, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex.1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* However, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003).

In reviewing the denial of the Ramco Parties' motion for judgment notwithstanding the verdict, we must consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex.2005). We must credit favorable evidence if a reasonable factfinder could do so and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827.

Under their third issue, the Ramco Parties assert the trial court erred in denying their motion for judgment notwithstanding the verdict because the evidence does not prove with reasonable certainty the profits Plaintiffs claim to have lost as a result of the Ramco Parties' breaches of contract. A party seeking to recover lost profits on a breach-of-contract claim must prove the loss with reasonable certainty. *Tex. Instruments, Inc. v. Teletron Energy Mgm't, Inc.*, 877 S.W.2d 276, 279 (Tex.1994). Evidence of lost profits must not be uncertain or speculative. *Id.* Whether evidence of lost profits is speculative depends upon the facts and circumstances of each particular case. *Id.*

Profits are not required to be exactly calculated; it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness. *Id.* Opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994). Plaintiffs cannot recover profits that are largely speculative, such as activities dependent on uncertain or changing market conditions, chancy business opportunities, promotion of untested products, entry into unknown or unviable markets, or on the success of new and unproven enterprises. *Id.* Factors like these and others that make a business venture risky preclude a retrospective recovery of lost profits. *Id.* If the business is shown to have been already established and profitable when the contract was breached, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. *Id.*

## Is there evidence that proves Plaintiffs' lost profits with reasonable certainty?

The jury found that Plaintiffs suffered $6.4 million in lost profits resulting from the Ramco Parties' breaches of their confidentiality agreement. The only actual damages awarded to Plaintiffs against the Ramco Parties were these lost-profits damages. The jury ultimately found that, as a natural, probable, and foreseeable result of Halliburton's and the Ramco Parties' breaches, Central Asia was able to purchase Kazakhtenge's interest in the Joint Enterprise. Plaintiffs assert that, absent these breaches, Plaintiffs would have been able to (1) buy the Taiwanese Company's and Tenge Development's interests in Kazakhtenge, (2) develop the Tenge Field in accordance with their expert's production plan, (3) produce and market more than 100 million barrels of oil and 911 billion cubic feet of gas from the Tenge Field, and (4) generate substantial revenues and profits for Plaintiffs after deducting the expenses and costs of financing. Under Plaintiffs' lost-profits damage model, (1) Plaintiffs would have been able to purchase the Taiwanese Company's and Tenge Development's interests in Kazakhtenge in accordance with the regulations governing Kazakhtenge (hereinafter "Kazakhtenge Regulations"); (2) Plaintiffs would have obtained financing to purchase these interests; (3) Plaintiffs would have obtained financing allowing them to drill 96 wells in the Tenge Field without losing any of their 100% equity interest in Kazakhtenge; and (4) the Tenge Field would have been highly productive and profitable.

### Plaintiffs' Experts

Plaintiffs' evidence of damages came primarily from the testimony of two experts, John Brickhill, the leader of a team that performed an economic analysis of the Tenge Field, and George Schaefer, a petroleum engineer and member of the same team that Plaintiffs hired to do a projection of production from the Tenge Field.

### Schaefer's Testimony

Schaefer worked for ten months projecting the Tenge Field's production, using data that Anglo Dutch provided him.[10] Schaefer determined that the Tenge Field, which measures approximately 19 square miles, had 717 million barrels of oil and 1.7 trillion cubic feet of gas below the surface. Schaefer and his staff, making allowances for cost-effectiveness and the technology available in the late 1990s, calculated the following projections for total oil and gas production from the third quarter of 2000 through the end of 2018:

- 137.9 million barrels of oil, or 19% of the Tenge Field's oil
- 911 billion cubic feet of gas, or 55% of the Tenge Field's gas

Schaefer's production plan called for the use of gas injection wells to increase oil production by pressurizing the oil. Under this production plan, 96 wells would be used to produce oil and gas as follows:

- 10 reworked vertical wells
- 24 new vertical wells
- 40 new horizontal wells
- 11 new horizontal gas injector wells
- 11 new horizontal water injector wells

Schaefer's plan designates the location of these wells where he believed recovery would be maximized. Under this plan, oil

---

10. In many places in the record and in the briefs reference is made to "Anglo Dutch" and it is unclear if this means one or both Plaintiffs, or an affiliated Anglo Dutch entity. In this opinion, we refer to both Plaintiffs together as "Plaintiffs." If the record portion we are describing refers to "Anglo Dutch" without clarifying which entity is meant, then we, too, will use "Anglo Dutch."

would be produced for the first ten years, followed by gas production through the end of the term.

Schaefer testified that, in conducting his analysis, he followed "standard operating procedure in our business" and calculated what he believed could be produced if the Tenge Field were developed. Schaefer calculated the oil-recovery factor for the life of the Tenge Field to be 26%, with 19% (137.9 million barrels) recovered in the first nineteen years. Schaefer based his gas-production profile on the 725 billion cubic feet of gas the Soviets produced from the shallower horizons.

### Brickhill's Testimony

Brickhill testified that he had worked in the field of economic analysis since 1969. According to Brickhill, there are generally accepted methods used in the oil and gas industry to calculate an oil field's value, and his team used industry-accepted methods in its economic analysis of the Tenge Field, though he had never been to Kazakhstan, where the Tenge Field is located. Brickhill testified that the steps for calculating the oil field's value are to project (1) revenues, (2) likely expenses, (3) field income, (4) the client's share of the field income, (5) the client's share of lost profits, and (6) the discounted present value of that projected profit stream. Brickhill's team calculated oil and gas revenues for 2000 through 2018, when the initial term of Kazakhtenge's agreement with the Gas Production Association was to expire. In his analysis, Brickhill relied on Schaefer's oil revenue calculations.

Brickhill's team calculated that, if both oil and gas were produced, then 137.9 million barrels of oil could be generated from

the Tenge Field between 2000 and 2018. If only oil were produced, the field would yield 171.0 million barrels of oil during this time frame.[11] Explaining his calculations, data use, and methodology, Brickhill testified as follows:

- In calculating the price of oil, he used the historical price for past periods. For future production, he primarily relied on the United States Department of Energy's forecasts of the price of oil.
- He calculated revenues by multiplying the number of oil barrels by the price per barrel of oil.
- The Tenge Field would generate oil revenues totaling $3.682 billion through 2018, based on the production of both oil and gas.
- The Tenge Field would generate oil revenues totaling $4.755 billion through 2018, based on the production of only oil.
- In calculating gas revenues, Brickhill developed an independent forecast for the price of gas, using a price of $2.42 per thousand cubic feet ("mcf") of gas. He multiplied this price by 911,000,000 mcf, which is the amount of gas Schaefer believed would be produced from the Tenge Field.

Brickhill calculated that, if both oil and gas were produced from the Tenge Field, the total gross oil and gas revenues through 2018 would be $5.895 billion. Explaining his analysis, Brickhill testified that the fact that Halliburton's and Ramco's calculations were close to those of his team made him even more confident in his team's numbers.

Brickhill calculated that the total expenses would be $2.315 billion.[12] By sub-

11. According to Brickhill, (1) Halliburton had calculated that, if only oil were produced, 161.2 million barrels of oil could be produced from the Tenge Field between 2000 and 2018, and (2) Ramco calculated that, if only oil

were produced, 162.9 million barrels of oil could be produced from this field during this period.

12. As to expenses, Brickhill calculated projected expenses for drilling and operating

tracting expenses from revenues, Brickhill calculated the "field income" as $3.58 billion. He divided this number in half to reflect the Gas Production Association's 50% share, which leaves $1.79 billion. Brickhill concluded that $2 million would be needed for Anglo Dutch to acquire interests in Kazakhtenge. He noted that in 2000, Anglo Dutch had tried to "buy out" the parties owning interests in Kazakhtenge. Brickhill referred to these parties as "old investors," the major one being the Taiwanese Company.[13]

Brickhill explained that to finance Anglo Dutch's buyout of the "old investors" and its development of the Tenge Field, Anglo Dutch would have to obtain financing from new investors. Brickhill set the costs of this financing at 25% of Kazakhtenge's share of the field income, which he calculated as $447.5 million. Brickhill stated that this cost figure was probably too high but he did not want to overstate the damages. Brickhill estimated that, at a ten percent discount rate, $140 to $200 million in outside financing could be attracted. He anticipated that Shell, Citibank, Lukoil, or Van Dyke's brother-in-law would pro-

vide this "new investor" financing. Brickhill testified that, after subtracting this $447.5 million, Anglo Dutch's share of the lost profits for the nineteen-year term would be $1.3 billion. Brickhill's team calculated the present value of the stream of lost profits at $640 million.

Brickhill stated that his model reflects that Van Dyke would have had the $22.8 million necessary to acquire the Kazakhtenge members' interests. Although Brickhill said during his deposition that he assumed Van Dyke would be able to buy out all of the Kazakhtenge members,[14] by the time he testified at trial, Brickhill had seen a document suggesting that Van Dyke would have been able to acquire all of these interests. This document is a February 8, 2000 e-mail from Fred Tresca of Golden Eagle—a person not affiliated with any of the Kazakhtenge members. Brickhill testified that, in this e-mail, Tresca told Lee Henkel, a lawyer for the Taiwanese Company, that Tresca understood that the Taiwanese Company and others had accepted or were about to accept Van Dyke's offer. Brickhill believed that, although Van Dyke's November 29, 1999

wells, production expenses, processing expenses, transportation expenses, taxes, contractual civic development payments, and other expenses. However, Brickhill's team did not make any cost estimates for the transportation of gas.

13. According to Brickhill, the Taiwanese Company had "political reasons" for wanting out of this investment, however, he relied on Van Dyke for this information.

14. Brickhill had not talked to Van Dyke regarding the state of AD Tenge's or AD International's financial situations in the 1996 through 1999 time frame, nor had he discussed with Van Dyke what the latter's personal financial situation was in the 1998 through 2000 time frame. At his deposition, Brickhill relied on Van Dyke's statement that he had access to the funds necessary to buy out the Kazakhtenge members, but at trial he testified that he no longer needed to rely on

Van Dyke's account because he had seen "facts" independently demonstrating that this was true. Additionally, Brickhill testified that

• Van Dyke told Brickhill that he had sufficient capital to buy out the other Kazakhtenge members.
• Brickhill knows that Van Dyke could have obtained the cash down payment as well as the more than $20 million dollars that would eventually be necessary to buy out these members. Brickhill had seen documents and testimony that the money was available. Brickhill, however, did not recall seeing a contract in which anybody had agreed to advance Van Dyke the funds necessary to buy out the other Kazakhtenge members.
• Brickhill had not seen any contract containing a binding commitment to make funds available to AD Tenge or AD International to purchase the interests of the other Kazakhtenge members.

offer was rejected initially, the same offer was later accepted in February 2000.[15]

Brickhill did not dispute that Plaintiffs' damage model depends on Van Dyke's ability to obtain financing and buy out the Kazakhtenge members. If Van Dyke could not acquire the interests of these members, there would be no lost profits. Brickhill's model also assumes Van Dyke would get the approximately $14 million from outside investors needed to start production, without which, Brickhill acknowledged, Van Dyke would have no lost profits.

Although Brickhill was not aware of any commitments from lenders who would advance the $14 million to start production, he claimed he had seen indications that Citibank, Shell, or Lukoil would lend Van Dyke these funds. Brickhill testified that it would be "ridiculous" to assume that Van Dyke would be unable to obtain any financing because Van Dyke's brother-in-law had said he would lend Van Dyke $2 million. Furthermore, Brickhill testified that he believed Van Dyke could have bought out the Kazakhtenge members by paying only $220,000 up front, plus additional payments later. According to Brickhill, Van Dyke's "dream and business plan" was to obtain control of Kazakhtenge by buying the Taiwanese Company's 66.5% interest and then to produce and market the Tenge Field's oil and gas.

Under Brickhill's model for oil and gas production in the Tenge Field, there would be no gas production for the first ten years and therefore no gas revenue to help fund development of the field. If the oil wells in the first ten years did not produce enough oil to pay for field development, then there would be no profits because the field would not produce oil in sufficient quantities to pay for the development of the field. Without oil revenues, there would be no funds to continue development of the field. Likewise, if the gas could not be produced economically and sold profitably, then continued development of the gas wells would cease.

Brickhill candidly admitted that he did not know about the state of Van Dyke's relationship with the other Kazakhtenge members and did not independently investigate whether those Kazakhtenge members would have agreed to sell Van Dyke their interests. Van Dyke did not tell Brickhill that his relationship with the Kazakhtenge members had been "very rough" over the years. Brickhill testified that, even if some Kazakhtenge members disliked Van Dyke, Anglo Dutch only needed to have purchased the Taiwanese Company's interest because that would have provided Anglo Dutch with a majority, controlling interest in Kazakhtenge. Brickhill acknowledged that section 11.01 of the Kazakhtenge Regulations provides that transfers of interests in Kazakhtenge must be approved by all Kazakhtenge members, rather than by a vote of the holders of a majority of the interests in Kazakhtenge. However, he later testified that he believed Plaintiffs could have bought the Taiwanese Company's interest in Kazakhtenge without the members' consent if the Taiwanese Company had assigned all of its rights to distributions to Plaintiffs under section 11.02 of the Kazakhtenge Regulations and agreed to always cast its vote in Kazakhtenge matters as directed by Plaintiffs.[16]

---

15. Brickhill also noted that in the same e-mail, Tresca mentioned a conversation he had with Mingson Juang, a corporate official with the Taiwanese Company. Brickhill concluded that this e-mail indicated that the Taiwanese Company and others had accepted or were about to accept Van Dyke's offer.

16. According to Brickhill, it would make no sense for people to agree to a unanimity requirement for the assignment of interests in a limited liability company like Kazakhtenge. To him, common sense suggested that if Jonathan Romero (former administrative member

Brickhill was aware that Orrin Hein (who was administrative member of Sugarland at the time of trial) had made statements that his company would not accept any offer from Van Dyke based on any kind of contingency payment. Nothing that Brickhill saw in his work on this case led him to believe that Tenge Development would sell Van Dyke its interest in Kazakhtenge, and Van Dyke did not tell Brickhill that he believed Tenge Development would sell him its interest in Kazakhtenge. Rather, Van Dyke told Brickhill that he could obtain a majority of the interests in Kazakhtenge, and Brickhill believed him. However, Brickhill knew of no documentation in which Sugarland indicated it would vote for and agree to Plaintiffs' purchase of the Taiwanese Company's interest in Kazakhtenge.

### Tenge Development's Approval as a Prerequisite to Plaintiffs' Purchase of the Kazakhtenge Interest

■ In arguing that the evidence of lost profits is speculative and not reasonably certain, the Ramco Parties assert that, even if Central Asia had not purchased Kazakhtenge's interest in the Joint Enterprise, Tenge Development would not have approved Plaintiffs' purchase of any member's interest in Kazakhtenge. Plaintiffs argue that Tenge Development's approval was not necessary. Therefore, we examine whether Plaintiffs needed Tenge Development's approval.

First, we note that Brickhill was inconsistent as to whose interest in Kazakhtenge the Plaintiffs would have needed to purchase. On direct examination, Brickhill testified that Plaintiffs' damage model was based on Plaintiffs' owning all of Kazakhtenge's equity. He projected that, to accomplish this acquisition of interests, Plaintiffs would purchase the interests of

the "old investors" in Kazakhtenge. Although the only entity Brickhill mentioned by name as an "old investor" was the Taiwanese Company, Brickhill's calculations were based on Plaintiffs' owning all of the equity, meaning Plaintiffs would have had to acquire both the Taiwanese Company's and Tenge Development's interests in Kazakhtenge.

Tenge Development's approval obviously would have been required to purchase its interest; however, on redirect examination, Brickhill testified that part of Van Dyke's "dream and business plan" was to obtain control of Kazakhtenge by purchasing only the Taiwanese Company's interest in Kazakhtenge. Although Brickhill did not change his damage model to allow for payments of profits to Tenge Development as a continuing member of Kazakhtenge, Brickhill asserted on redirect examination that the Taiwanese Company was the only "old investor" whose interest Plaintiffs needed to acquire to obtain control over Kazakhtenge. Brickhill indicated that Plaintiffs could have obtained approval of their purchase of the Taiwanese Company's 66.5% interest by having the Taiwanese Company cast a majority vote in favor of the purchase. To evaluate this part of Brickhill's testimony regarding the purchase of only the Taiwanese Company's interest, we first determine whether Plaintiffs needed Tenge Development's approval to buy only the Taiwanese Company's interest in Kazakhtenge.

The unambiguous language of the Kazakhtenge Regulations shows that Tenge Development's approval would have been required because unanimous approval of all Kazakhtenge members is necessary for the assignment of any or all of a member's interest:

11.01 Requirements Applicable to Assignment

of Sugarland) had veto power over Van Dyke's purchase of the Taiwanese Company's

interest, Romero would have mentioned this power, but he did not.

No assignment of all or any portion of a Member's Interest, other than those provided for in Section 4.05, shall be valid or permitted unless approved by a unanimous vote of the other Members. No assignee of any Interest of a Member shall have any rights in and under the Regulations, the Foundation Agreement and Charter, or the Tenge Field unless or until such assignment is approved and such assignee expressly undertakes in writing, in a form satisfactory to all of the non-assigning Members, to perform the obligations of the assignor, and provides any parent guarantees or other assurances, plus reimbursement of any transactional costs as all of the non-assigning Members may determine to be necessary.

Because section 4.05 would not have applied, under section 11.01 of the Kazakhtenge Regulations, Plaintiffs would have needed Tenge Development's approval before purchasing the Taiwanese Company's interest in Kazakhtenge.

When confronted with the Kazakhtenge Regulations, Brickhill admitted that section 11.01 requires members' unanimous approval for assignments of interests in Kazakhtenge. However, Brickhill later testified that he believed Plaintiffs could have acquired the Taiwanese Company's interest without Tenge Development's approval by having the Taiwanese Company (1) assign all of its rights to Kazakhtenge distributions to Plaintiffs under section 11.02 of the Kazakhtenge Regulations and (2) agree to always cast its vote in Kazakhtenge matters as directed by Plaintiffs. Section 11.02 of the Kazakhtenge Regulations reads, in pertinent part, as follows:

11.02 Assignment of Rights to Distributions and Mortgage of Interest

A Member may assign all or a portion of its rights to Distributions, and may mortgage, pledge or otherwise encumber all or part of its Interest, without having first to obtain any approvals from the other Members, provided that: (i) such Member shall continue to exercise control of the vote associated with its Interest and shall remain liable for all obligations relating to such Interest ...

Under the unambiguous language of the Kazakhtenge Regulations, the Taiwanese Company and Plaintiffs, as a matter of law, could not have used section 11.02 to avoid the need for Tenge Development's approval if, as posited by Brickhill, the Taiwanese Company would be contractually obligating itself to vote as directed by Plaintiffs. This voting agreement would violate the Taiwanese Company's obligation to "continue to exercise control of the vote associated with its Interest," as required by section 11.02.[17] Therefore, we conclude that section 11.02 would not have provided a means by which Plaintiffs could have circumvented the requirement of Tenge Development's approval of Plaintiffs' purchase of the Taiwanese Company's interest.[18]

17. Brickhill did not testify as to how the Taiwanese Company's continuing obligations under the Kazakhtenge Regulations would be handled in this scenario. Even if Plaintiffs indemnified the Taiwanese Company for its obligations under the Kazakhtenge Regulations, in light of Plaintiffs' liquidity and credit difficulties, it would be speculative to presume that the Taiwanese Company would have agreed (1) to have continuing duties and monetary obligations under the Kazakhtenge Regulations relating to an interest that it wanted to transfer and from which it would derive no future benefit and (2) to rely on Plaintiffs' ability to reimburse the Taiwanese Company for its future expenses and liabilities under the Kazakhtenge Regulations.

18. We also note that, although Brickhill's model was not based on Plaintiffs' purchasing Kazakhtenge's interest in the Joint Enterprise, Central Asia did structure its transaction in this manner, and some of Van Dyke's rejected offers involved a company controlled by him purchasing Kazakhtenge's interest in the Joint

In sum, under the unambiguous language of the Kazakhtenge Regulations, as a matter of law, Tenge Development's approval would have been required for any sale of the Taiwanese Company's interest in Kazakhtenge to Plaintiffs. Brickhill testified that Sugarland did not mention this need for Tenge Development's approval in its correspondence; however, Sugarland's omission does not change or waive the unambiguous language of the Kazakhtenge Regulations requiring such approval. Brickhill also testified that it would make no sense for the Taiwanese Company to have agreed to a unanimous-approval requirement for such transactions and that he did not believe the Taiwanese people who run the Taiwanese Company are "stupid." Regardless of Brickhill's views and the Taiwanese Company's folly or wisdom in agreeing to the Kazakhtenge Regulations, these regulations have not been challenged or set aside, and we must give force to their unambiguous language as written. *See Schaefer*, 124 S.W.3d at 161–62. We cannot rewrite the relevant provisions under the guise of interpretation. *See id.*

### Evidence that Tenge Development Would Have Approved Plaintiffs' Purchase of the Taiwanese Company's Interest

Brickhill testified that Plaintiffs' damage model depends on Van Dyke's ability to acquire the Kazakhtenge members' interests. Brickhill agreed that, without such a buyout, there would be no lost profits. As discussed above, Tenge Development needed to approve the purchase by Plaintiffs of any interest in Kazakhtenge, whether the interest in question was the Taiwanese Company's or Tenge Development's. Therefore, Plaintiffs' damage model depends on Tenge Development's approval for Plaintiffs' purchase of at least the Taiwanese Company's interest in Kazakhtenge, if not the other interests. However, the evidence that Tenge Development would have approved such a purchase is speculative at best.

To put this issue in context, it is helpful to consider the prior dealings among the members of Tenge Development and the resulting friction in their relationship. Sugarland became the administrative member of Tenge Development on June 4, 1996. At all material times, Tenge Development was the administrative member of Kazakhtenge, which was the operator of the Joint Enterprise. Sugarland took over this position after AD Tenge was terminated as the administrative member of Tenge Development. Orrin Hein of Sugarland testified that AD Tenge was terminated as administrative member because (1) the other members had lost confidence in Van Dyke, (2) they no longer trusted Van Dyke's business judgment, (3) AD Tenge had sought reimbursement for alleged expenditures without necessary backup data, and (4) AD Tenge had entered into a confidentiality agreement that prevented third parties from disclosing information to the other members. Hein stated that, on behalf of AD Tenge, Van Dyke had refused to accept AD Tenge's termination as administrative member, forcing the members into arbitration. The arbitrator confirmed

Enterprise. Although Brickhill's damage calculations were not based on this type of transaction, even if they had been, the Kazakhtenge Regulations still would have required Tenge Development's approval. Section 7.13(a) of the Kazakhtenge Regulations requires unanimous approval of the Kazakhtenge members for "selling, leasing, ex-

changing, terminating or otherwise disposing of [Kazakhtenge's] interest in [the Joint Enterprise], ... or all or substantially all [Kazakhtenge's] other property and assets." Therefore, even under this structure, Plaintiffs still would have needed Tenge Development's approval.

AD Tenge's removal as the administrative member of Tenge Development and its replacement by Sugarland.

In 1997, there was another arbitration between AD Tenge and the other members of Tenge Development. In that proceeding, the arbitrator determined that AD Tenge had breached its fiduciary duty to Tenge Development and the other members of Tenge Development by usurping a business opportunity belonging to Tenge Development—the chance to acquire part of the Israeli Company's interest in Kazakhtenge after the Israeli Company decided it no longer wished to fund future Kazakhtenge cash calls. AD Tenge had given this business opportunity to its affiliate AD Neftenge rather than to Tenge Development. As a remedy for AD Tenge's breach of fiduciary duty, the arbitrator placed AD Neftenge's interest and membership in Kazakhtenge in a constructive trust for Tenge Development's economic and voting benefit. The arbitrator also ruled that after July 14, 1997, Tenge Development would exercise all rights, including voting rights, of AD Neftenge as a member of Kazakhtenge.

In light of this history marked by conflict and discord between Sugarland (the administrative member of Tenge Development) and Van Dyke, and given that some of the compensation in any deal would come from future payments conditioned on the profitability of the Joint Enterprise and Kazakhtenge, it is not surprising that there is evidence in the record that Sugarland took a dim view of Van Dyke. Hein testified that a contingent payout from Van Dyke was highly speculative because Van Dyke already had spent $16 million and "gotten nowhere," and he had "absolutely no confidence that [Van Dyke] could spend more money and get anywhere." In fact, Tenge Development rejected a March 8, 2000 offer from a company controlled by Van Dyke, even though the offer's terms were substantially similar to those of Central Asia's successful offer. Hein explained that this offer was rejected because of a lack of confidence and trust in Van Dyke and a conclusion that an arm's length transaction with a reputable party like Central Asia was a better alternative.

Brickhill acknowledged that he had not seen any documentation in which Sugarland indicated it would vote for and agree to Plaintiffs' acquisition of the Taiwanese Company's interest in Kazakhtenge. Brickhill also stated that nothing he had read in his work on this case led him to believe that Tenge Development would sell its interest in Kazakhtenge to Plaintiffs. According to Brickhill, Van Dyke himself never stated a belief that Tenge Development would sell him its interest in Kazakhtenge, although he told Brickhill that he could obtain a majority interest in Kazakhtenge. Brickhill testified that he did not know about the state of Van Dyke's relationship with the other Kazakhtenge members in 2000. During his deposition, Brickhill said he assumed Van Dyke would have been able to buy out all of the Kazakhtenge members; however, at trial Brickhill stated that he had seen the February 8, 2000 e-mail from Fred Tresca of Golden Eagle to Lee Henkel, which Brickhill believed indicated the members would have sold Plaintiffs their interests. The e-mail's entire body reads as follows:

> I had a relatively long conversation with [Mingson Juang of the Taiwanese Company]. I advised that we were happy to meet in Taipei if that facilitated coming to an agreement. I also reiterated that they are free to propose ongoing participation by [the Taiwanese Company] if so desired.
>
> One comment that I did not quite understand was that Mingson mentioned that the his [sic] Board has already approved a level of payments based on an earlier

offer from Van Dyke and that our offer did not meet with the Boards [sic] earlier levels [sic] of approval. What does this mean?

I requested that if at all possible we would like comments back on our proposal before Friday as we do not want to show up in Istanbul simply to receive comments with no opportunity to reach an agreement.

He said that they would be meeting tomorrow to discuss our offer. Your input before that meeting could be helpful.

Although it may be unclear exactly what Mingson Juang was telling Tresca, several things are apparent. The e-mail does not involve an officer or agent of Tenge Development or Sugarland, and nothing in this short communique involves or refers to Tenge Development or Sugarland. Nothing addresses whether Tenge Development or Sugarland would have approved Plaintiffs' purchase of the interest of any Kazakhtenge member. Furthermore, this e-mail does not state that the Taiwanese Company had accepted an offer from Van Dyke. If it had accepted Van Dyke's offer, the Taiwanese Company would not have been in negotiations with Central Asia and Golden Eagle. In the context of those negotiations, the Taiwanese Company told Golden Eagle that its latest offer was less than a "level of payments" that the Taiwanese Company's board previously had decided was a necessary part of an acceptable offer when considering an earlier offer from Van Dyke. In sum, this e-mail is not an objective fact or reasonably certain basis for concluding (1) Sugarland or Tenge Development would have approved Plaintiffs' purchase of the interest of any Kazakhtenge member or (2) the Taiwanese Company had accepted one of Van Dyke's offers.

Brickhill admitted that he did not independently investigate whether the Kazakhtenge members would have approved of Plaintiffs' acquisition of the interests of the Kazakhtenge members. He stated that "bluster and intimidation" can be a negotiation tactic to try to get a better deal. Brickhill also referred to letters from Sugarland in April and May of 1999 that have a more conciliatory tone and that discuss the possibility of the acquisition by one of Van Dyke's companies of Tenge Development's interest in Kazakhtenge or Kazakhtenge's interest in the Joint Enterprise.[19]

Although it is possible that Tenge Development would have approved Plaintiffs' purchase of either or both of the Taiwanese Company's or Tenge Development's interests in Kazakhtenge, or Kazakhtenge's interest in the Joint Enterprise, the evidence does not show a reasonable certainty that any such approval would have been obtained. Brickhill's testimony that the transaction would have occurred is speculative and based on an irrelevant document, the e-mail from Tresca. *See Szczepanik*, 883 S.W.2d at 650 (holding evidence company could have expected to retain accounts for lifetime of accountholders lacked evidentiary foundation and was speculative, as part of plaintiff's lost-profits damage model).

### *Financing and Maintaining of Plaintiffs' Ownership Interest in Kazakhtenge*

Even if Tenge Development had approved Plaintiffs' acquisition of the Kazakhtenge members' interests, Plaintiffs still would have had to finance the purchase of these interests and then finance the development of the Tenge Field under Schaefer's production plan. Brickhill testified

19. Brickhill also stated that the facts indicate Van Dyke would have purchased the interests of the other Kazakhtenge members; however, this statement is conclusory.

that, even though Central Asia paid $2 million in cash at closing plus future conditional payments, he believed that Plaintiffs could have purchased the interests of the Kazakhtenge members for only $220,000 in cash at closing plus future conditional payments.[20] Brickhill based this belief on a November 29, 1999 offer from Van Dyke on these terms. Although that offer was rejected, Brickhill believed it was later accepted, a belief based solely on the February 8, 2000 e-mail from Tresca to Henkel. However, at most, this e-mail details an alleged statement by Mingson Juang of the Taiwanese Company that the Taiwanese Company had set a minimum "level of payments" based on an earlier offer from Van Dyke and that Central Asia's current offer did not meet that minimum. It does not state that the Taiwanese Company had accepted an offer from Van Dyke or any of his companies, nor does it specify whether the "level of payments" refers to cash to be paid at closing or to future conditional payments. The e-mail also does not specify the Van Dyke offer to which the Taiwanese Company refers, and it does not state that the offer's "level of payments" was $220,000. Even presuming that Plaintiffs could have bought out the Kazakhtenge members for $220,000 in cash at closing plus future conditional payments,[21] Plaintiffs would have had to pay $220,000 plus the initial $14 million that Brickhill testi-

fied would be needed to begin operations under Schaefer's production plan.[22]

The evidence at trial showed that Plaintiffs did not have significant cash on hand. Regarding the owners, Van Dyke and his mother, Plaintiffs stipulated that "[f]rom and after January 1, 1997, [Van Dyke] and [Van Dyke's mother] did not have sufficient personal cash, funds, equity, money, or similar financial resources, or any other form of cash, funds, equity[,] money, or similar financial resources under their possession, custody, control, to purchase, finance, or acquire any additional interest in the Tenge Field *or* to fund the exploration, development, or further financing of the Tenge Field."[23] Therefore, Plaintiffs would have had to obtain these funds from third parties other than Van Dyke and his mother.

Brickhill did not count on any funds coming from Plaintiffs, Van Dyke, or Van Dyke's mother. Rather, Brickhill testified that, to finance the acquisition of the Kazakhtenge members' interests and the development of the Tenge Field, Plaintiffs would have had to obtain financing from "new investors." Brickhill anticipated that Shell, Citibank, Lukoil, or Van Dyke's brother-in-law would provide this "new investor" financing. Although he used the term "new investors," Brickhill's damage model is based on Plaintiffs' owning all of the equity in Kazakhtenge, and Brickhill testified that the "new investors" would

20. Other parts of Brickhill's testimony seem to indicate that Plaintiffs would have paid $2 million in cash at closing. Plaintiffs also have indicated several times in their appellate arguments that they would have needed $2 million at the closing of such a transaction.

21. Brickhill testified that Plaintiffs eventually would have had to pay a total of more than $20 million to acquire the interests in Kazakhtenge; however, this sum includes the conditional future payments, which would have been required if the field were profitable, as predicted by Brickhill.

22. Brickhill testified that more than $300 million would be needed to develop the Tenge Field over the nineteen-year period; however, he calculated that much of the necessary funding would come from field production.

23. (emphasis added). Based on this stipulation, if Brickhill were correct that the interests of the Kazakhtenge members could be purchased for only $220,000 in cash at closing, then Van Dyke and his mother together had less than $220,000 in cash or equity.

not own a percentage of the company. Instead, Brickhill calculated that, for the entire nineteen-year term, Plaintiffs would pay a total of $447.5 million dollars to have access to $140 to $200 million of financing. Brickhill testified that he was being conservative and that $140 to $200 million is far in excess of the amount of outside financing that would have been required. Nonetheless, he acknowledged that he had not seen a contract containing a binding commitment from any source to make funds available to Plaintiffs to purchase the interests of the Kazakhtenge members. Although Brickhill was not aware of any loan commitments to lend Van Dyke $14 million to start production, he stated he had seen indications that Citibank, Shell, or Lukoil would lend these funds to Van Dyke.[24] Brickhill did not explain why he believed these entities would lend Plaintiffs this money; however, he stated that he was not surprised that no formal loan commitment had been made because Plaintiffs never bought the interests of the Kazakhtenge members and it would have been premature to obtain a commitment until these interests had been purchased.

The evidence shows that, as of the time period in question, approximately $16 million had been invested in the Tenge Field with no profit. The evidence also shows that Van Dyke unsuccessfully sought loans from Shell, Texaco, and Citibank[25] to ac-

**24.** On rehearing, Plaintiffs cite the testimony of David Adams regarding Baker Hughes as a possible source of financing. Brickhill did not refer to the possibility of obtaining financing from Baker Hughes during his trial testimony, nor did Plaintiffs refer to Baker Hughes in their appellate arguments on original submission. Even if this issue were properly before us, Adams's testimony does not change the outcome. Adams testified that, after discussions with Van Dyke, Baker Hughes offered to rework ten vertical wells in the Tenge Field for the Joint Enterprise. Baker Hughes was willing to advance all of the costs for these wells; however, it was only interested in reworking ten vertical wells, and it required that it receive payments from production sufficient to reimburse Baker Hughes for all of its costs within one year. Baker Hughes also required that (1) it continue receiving payments from production after it had recovered all its costs until it received an additional amount equal to 75% of its costs, and (2) any costs associated with failed or unproductive reworked wells be added to the amount of costs that would have to be repaid from production from other successful wells. Adams testified that Baker Hughes made an offer to Anglo Dutch, to which Anglo Dutch made a counteroffer that omitted certain commercial terms that Baker Hughes considered nonnegotiable. After Baker Hughes made it clear that the terms in question were not negotiable, it never heard back from Anglo Dutch. Adams also testified that he anticipated that the Joint Enterprise would have signed the proposed contract with Baker Hughes and that he understood that Anglo Dutch had authority to sign the contract for the Joint Enterprise. The record does not show whether Anglo Dutch or the Joint Enterprise would have found Baker Hughes's terms acceptable. Baker Hughes would not have been available to finance the other 86 wells under Schaefer's production plan. Brickhill did not base his calculations on Baker Hughes's financing ten reworked wells, and he did not calculate the repayment amounts or the impact of satisfying Baker Hughes's repayment terms.

**25.** On rehearing Plaintiffs point to two letters from Citibank and to testimony from James Lane regarding preliminary offers from Citibank to lend up to $20 million to AD International. The April 30, 1997 letter states that it is (1) without prejudice, (2) not a commitment, (3) subject to (a) "extensive due diligence," (b) Citibank internal approval, and (c) three fully tested wells. The July 1, 1997 letter was made subject to Citibank internal approval, satisfactory documentation, and "the availability of cross-border and political and regulatory conditions at the time of signing." James Lane is a former employee of Citibank. His testimony at trial indicated that any loan from Citibank would be subject to three fully tested wells that would provide evidence of the quality of the reservoirs in the Tenge Field. According to Lane, the loan from Citibank never reached that stage, and the preliminary offer of terms for the loan

celerate production of the Tenge Field. In the factual context reflected by the trial record, it was speculative for Brickhill to conclude that Plaintiffs would have obtained $14.22 million in financing to purchase the Kazakhtenge interests and start production under Schaefer's production plan. Likewise, it was speculative for Brickhill to conclude that Plaintiffs could have obtained this funding without giving any equity in Kazakhtenge to the lender(s). Moreover, even if an entity would have advanced $14.22 million to Plaintiffs without receiving an equity stake in the company, Brickhill's damage model also presumes that either (1) the lending entity would not have required Plaintiffs to pledge their interest in Kazakhtenge as collateral to secure the loan; or (2) if the lending entity did so require, no event of default would have occurred that would have resulted in Plaintiffs' loss of their interest in and right to receive profits from Kazakhtenge.[26] Additionally, Brickhill set the costs of obtaining financing at 25% of Kazakhtenge's share of the field income, but did not explain the basis for this determination. The evidence at trial that Plaintiffs would have obtained sufficient financing to acquire the interests of the Kazakhtenge members and to commence operations under Schaefer's production plan is speculative and not reasonably certain. *See Szczepanik,* 883 S.W.2d at

650 (holding evidence that was part of plaintiff's lost-profits damage model lacked evidentiary foundation and was speculative); *see also United Way of San Antonio v. Helping Hands Lifeline Found., Inc.,* 949 S.W.2d 707, 712 (Tex.App.-San Antonio 1997, writ denied) (holding evidence of damages speculative and insufficient as a matter of law because it was based on the mere hope for funding renewable at the discretion of another party).

### Productivity and Profitability of the Tenge Field

Brickhill relied on Schaefer's opinions as to how much oil and gas Plaintiffs could recover from the Tenge Field. Schaefer testified that, under his production plan using 96 wells, the Tenge Field would produce 137.9 million barrels of oil and 911 billion cubic feet of gas over a nineteen-year period. Schaefer also testified as follows:

● He is "pretty certain" that his projections reflect what would be produced under his plan. On a certainty scale of one to ten, Schaefer is about an "eight" as far as certainty.

● In his opinion, it is not speculative that 19% of the oil in the Tenge Field can be produced over this nineteen-year period.

● He used generally accepted mathematical techniques and formulas to

---

was also subject to additional analysis, investigation, and due diligence, which was never performed. Van Dyke testified that the reason he did not pursue a loan with Citibank was that Halliburton told him not to do so because Halliburton could provide cheaper financing. However, Van Dyke also testified that, after Halliburton notified him that it was no longer interested in participating in the development of the Tenge Field, Van Dyke contacted Citibank in late 1998 about the possibility of the $20 million loan, and Citibank told him that it had no funds that it could make available for a loan in Kazakhstan.

**26.** Brickhill did not refer to the possibility of obtaining financing from Intercapital Resources Investments, Inc. during his trial testimony. Plaintiffs did not refer to Intercapital in their appellate arguments on original submission. However, on rehearing, Plaintiffs cite an October 1999 letter from Intercapital containing a preliminary outline of a proposal to invest $5 million in the Tenge Field. Even if this issue were properly before us, the amount of the proposed investment was significantly less than $14.22 million, and the proposal indicates that Intercapital would require a pledge of 51% of the interest in the Tenge Field to secure the investment.

calculate the amount of oil to be produced.

- There has never been any oil commercially produced from the Tenge Field.
- In making his calculations, he did not use the production history for oil from the Tenge Field because there is no production history, just test data.
- Well 109 was drilled in 1974 and then reentered in 1997 and "tested."
- He did not use the production rates from the well 109 test data in making his calculations.
- The other well test achieved bad results, and well 109 initially produced oil at a stable rate for several months and then stopped producing in September 1997. Since then, to his knowledge, well 109 has never been back in production.
- The data from Central Asia's attempts to develop the Tenge Field was not available to him, and he did not know "what is going on in the Tenge Field."
- Most, if not all, of the reserves in the Tenge Field would not be categorized as proved reserves.

Brickhill testified as follows:

- Although AD Tenge has never had a dollar's worth of income since its inception and AD International has never had more than negligible income in its twelve to thirteen years of existence, there is no question that the operator of the Tenge Field will be able to profitably sell gas starting in 2010.
- Brickhill's team did not base its projections of oil production on the actual amount of oil produced from the Tenge Field in 2001 and 2002, although it had estimates of actual oil production for those years.

- Brickhill did not take into account in projecting the Tenge Field's future production what the history of oil production had been because Brickhill believes the past performance is irrelevant.
- Approximately three wells were worked over from 1990 to 2000 in the Tenge Field but Brickhill did not remember what happened to them, and he did not make an independent investigation to determine what happened to them. "That is not [his] area."
- Brickhill was not aware of any profit from the sale of oil in the Tenge Field at any time.
- The only profits from the sale of gas in the Tenge Field that Brickhill was aware of is "the Communist sense of profits, . . . and the Communists don't measure profits in dollars and cents the way we do. . . ."
- Brickhill was not aware of any cash flow from the sale of gas from the Tenge Field at any time. Brickhill had not seen any executed contracts for the sale of oil or gas from the Tenge Field, and, to his knowledge, no such contracts exist. Gas has not been sold from the Tenge Field.
- Although there has not been a commercial market for gas from the Tenge Field in the past, there is now.
- The only wells that Brickhill was aware of in the Tenge Field that were worked by Kazakhtenge are well 25 and well 109. No production was possible in well 25 because it was blocked by tools that had been left in the hole.[27] Well 109 produced some oil but is no longer producing oil.

We presume that Schaefer applied generally accepted mathematical techniques

---

**27.** Although during his testimony Brickhill referred to this well as "well 52," other testimony and exhibits show that the well to which Brickhill refers in his testimony is actually "well 25." Therefore, "well 25" is used throughout this opinion.

and formulas to the geological information available to him to calculate the oil and gas in place and the amount of oil and gas that would be recoverable under his 96–well production plan. Nonetheless, Plaintiffs' damage model is dependent upon production from the oil wells at the beginning of the plan to fund future development. This factor, combined with the significant financing that would have been necessary to acquire the Kazakhtenge interests and to fund the initial attempts to produce oil, would make production from the initial wells crucial to the success of Plaintiffs' undertaking. However, in calculating Plaintiffs' lost profits, Schaefer and Brickhill did not quantify the risk of failure to produce in this early stage of development. Schaefer predicted a prolific and profitable field; however, he did not take into account the history of no commercial oil production from the field, the absence of oil production from well 25, and the lack of significant oil production from well 109. Brickhill stated that he did not take the history of oil production into account in projecting the Tenge Field's future production because he believes the past production is irrelevant. Likewise, Brickhill predicted Plaintiffs could market 911 billion cubic feet of gas from 2010 to 2018, even though he admitted that, although the Soviets distributed gas from the Tenge Field among their citizens free of charge, no gas from the Tenge Field had ever been sold. Schaefer testified that most, if not all, of the reserves in the Tenge Field would not be categorized as proved reserves. The failure of the Plaintiffs' damage model to take into account the important historical data from the field also renders their damage calculations uncertain and speculative. *See Capital Metro. Transp. Auth. v. Cen. of Tenn. Ry. & Nav. Co., Inc.,* 114 S.W.3d 573, 578–82 (Tex. App.-Austin 2003, pet. denied) (holding there was no evidence to prove lost profits with reasonable certainty because expert's testimony was based on unfounded assumptions rather than objective facts or historical profitability); *Aquila Sw. Pipeline, Inc. v. Harmony Explor., Inc.,* 48 S.W.3d 225, 246 (Tex.App.-San Antonio 2001, pet. denied) (holding petroleum engineer's evidence of lost profits to two oil and gas wells was speculative where witness did not base his calculations on evidence of the historical profitability of the wells in question).

### *Reliance on Calculations by Halliburton and Ramco Oil*

At trial and on appeal, Plaintiffs have focused on calculations by Halliburton and Ramco Oil that the Tenge Field would be productive and profitable. These calculations include production projections that, although different in some respects, are similar to Schaefer's projections regarding the total amount of projected production. Plaintiffs assert, and Brickhill and Schaefer testified, that these calculations confirm that their projections are conservative, correct, and reasonably certain. However, Halliburton and Ramco Oil created these calculations for their own use in analyzing their prospective business opportunities. They did not submit or test these calculations in litigation for the purpose of recovering lost profits on a breach-of-contract claim.[28] Companies are free to create speculative, optimistic, and conjec-

---

28. This point distinguishes the *Nip* case cited by Plaintiffs in which this court took into consideration the fact that the methodology challenged by a party also was endorsed by the challenging party's expert in his *trial testimony. See Nip v. Checkpoint Sys., Inc.,* 154 S.W.3d 767, 772 (Tex.App.-Houston [14th Dist.] 2004, no pet.). The Ramco Parties did not introduce expert testimony at trial that was dependent upon the same elements of Plaintiffs' evidence that they now challenge on appeal. Therefore, *Nip* is not on point.

tural projections and to rely upon them in making business decisions. However, the mere existence of similar projections created by a company other than the plaintiff, even by a defendant in the breach-of-contract action, does not obviate the need for courts to apply the "reasonable certainty" test, nor does it indicate conformity with this legal standard. *See Tex. Instruments, Inc.*, 877 S.W.2d at 280 (rejecting plaintiff's strenuous argument that projections must be reasonably certain proof of lost profits because even the defendant—Texas Instruments, Inc.—believed they were reasonable when they were made). The fact that Halliburton and the Ramco Parties at one time may have shared Plaintiffs' hopes regarding the Tenge Field does not add any substance to Plaintiffs' proof of lost profits.[29] *See id.*

### Conclusory Statements

Schaefer and Brickhill made several statements that their calculations were "conservative," "reasonable," "not speculative," "based on reality," or "based on facts." At various times, Brickhill and Schaefer stated that they were "reasonably certain" about their projections. These conclusory and self-serving statements by the experts describing their own analysis do not affect this court's need to conduct an independent review of the rec-

ord to determine if the evidence satisfies the "reasonable certainty" test. *See, e.g., Aquila Sw. Pipeline, Inc.*, 48 S.W.3d at 246 (holding petroleum engineer's evidence of lost profits to two oil and gas wells was speculative, even though expert used standard methodologies in his calculations and testified that his calculations of lost profits were conservative).

### The One–Percent Solution

Plaintiffs' damage model showed that they suffered $640 million in lost profits. Although this lost-profits model was the same for both Halliburton and the Ramco Parties, the jury found Plaintiffs had sustained $64 million in lost profits as to Halliburton and $6.4 million in lost profits as to the Ramco Parties. Plaintiffs assert on appeal that any error regarding their lost-profits evidence is harmless because, by reducing their calculation of lost profits by ninety-nine percent, the jury "has wrung out of the verdict any speculation." Plaintiffs argue that "[w]hen the jury award against [the Ramco Parties] is only one percent of what the experts calculated, Plaintiffs should not be put in the position of having to justify the experts' actual figures." Texas jurisprudence on lost profits does not support this proposition. The two cases cited by Plaintiffs are not on point.[30]

---

**29.** Plaintiffs also assert that other trial evidence supports their recovery of lost-profits damages. Plaintiffs cite twenty-four trial exhibits. These exhibits show projections of potential production from the Tenge Field, various operating costs, cash flow, and other data. Most of these exhibits are internal work product from Halliburton or Ramco Oil. Plaintiffs also cite the testimony of their expert John Wood that (1) with help from Halliburton and Ramco, Van Dyke should have been able to buy the Kazakhtenge interests and (2) even without this help, Plaintiffs would have recruited others to help them buy these interests because, in Wood's opinion, this is an economically viable field that should have been developed. These exhibits and this

testimony do not constitute evidence that proves with reasonable certainty what profits Plaintiffs lost as a result of the Ramco Parties' breaches of contract.

**30.** *See GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 619–20 (Tex.1999) (holding that trial court's error in admitting expert testimony as to whether defendant's conduct was extreme and outrageous was harmless because the expert testimony was cumulative of the abundant evidence at trial showing that this conduct was extreme and outrageous); *Tex. Elec. Serv. Co. v. Wheeler*, 550 S.W.2d 297, 301 (Tex.Civ.App.-Fort Worth 1976) (stating an obiter dictum in legal-sufficiency analysis in condemnation case that did not involve lost

■ Moreover, Plaintiffs' argument overlooks the possibility that there may have been no profits at all, if, for example, Plaintiffs could not have garnered the necessary approval to acquire the Kazakhtenge interests or obtained sufficient financing to purchase them. Furthermore, if there is no evidence proving lost profits with reasonable certainty, the trial court must render a take-nothing judgment as to lost-profits damages; it cannot simply reduce the amount of lost-profits damages or endorse a formulaic reduction of these damages by the jury. *See, e.g., Tex. Instruments, Inc.,* 877 S.W.2d at 281 (concluding there was no evidence to prove lost profits with reasonable certainty and affirming trial court's order granting judgment notwithstanding the verdict as to the lost-profits damages). For these additional reasons, Plaintiffs' argument lacks merit.

### Summary

Schaefer testified that developing the Tenge Field is a "technical challenge" and demands "a particular sophisticated oil company expertise." Nonetheless, he conceded that, to his knowledge, Van Dyke does not have any experience operating oil fields. According to Brickhill, this lack of experience is irrelevant because Van Dyke could have hired others to operate the field. He testified that $14.22 million would have been needed to purchase the Kazakhtenge interests and to begin production in the Tenge Field. Although Plaintiffs and Van Dyke had little cash on hand that would have been available for investment in the Tenge Field, Brickhill testified that Plaintiffs could have obtained financing from a third-party lender. This lender, according to Brickhill's calculations, would not have required an equity position in Kazakhtenge and either would not have required Plaintiffs to pledge their

interest in Kazakhtenge or would have required the pledge and Plaintiffs never would have defaulted on their obligations. Brickhill did not explain the basis for his opinions in this regard, nor did he produce any data upon which he relied in concluding that Plaintiffs would have obtained this third-party financing arrangement. In light of the past failure of the field to produce oil or gas for sale and Kazakhtenge's past investment of $16 million in the Tenge Field with no profit, it is speculative to conclude that such financing would have been available. Furthermore, to even acquire the Kazakhtenge interests in the first place, Plaintiffs would have needed the approval of Tenge Development. Beyond speculation and an attempt to circumvent the need for Tenge Development's approval that fails as a matter of law, Brickhill did not explain why Tenge Development was likely to approve this transaction. On this record, it is highly uncertain that it would have done so.

In sum, to realize Van Dyke's "dream and business plan," Plaintiffs first would have needed to obtain approval from Tenge Development. Then, despite the lack of profitable production from the Tenge Field in the past, Plaintiffs would have had to convince a third-party lender to put millions of dollars at risk, without compromising Plaintiffs' equity stake and right to all of the profits in the event of success. Plaintiffs' lost-profits calculations are not based on a business that already was established and making a profit when the contract was breached. The fervent hope of Brickhill and Schaefer for Plaintiffs' success in obtaining financing, buying the Kazakhtenge interests, and producing and marketing oil and gas from the Tenge Field under Schaefer's production plan is not enough to warrant recovery of lost profits. *See Tex. Instruments, Inc.,* 877

profits or the reasonable-certainty test), *aff'd on other grounds,* 551 S.W.2d 341 (Tex.1977).

S.W.2d at 280 (stating that "[t]he mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits"). Plaintiffs' proof of lost profits is largely speculative, dependent on uncertain and changing market conditions, and based on risky business opportunities and the success of an unproven enterprise. Thus, it is insufficient for recovery. *See id.*

After carefully examining the complicated facts and circumstances of this case, as developed in this extraordinarily voluminous record, and applying the applicable standard of review, we conclude that there is no evidence to prove with reasonable certainty what profits Plaintiffs lost as a result of the Ramco Parties' breaches of contract.[31] *See id.* (holding there was no evidence to prove lost profits with reasonable certainty because there was no history of profits and because, even though there was evidence of a market, the viability of the product was in doubt because it was a new product that had not yet been created); *Burkhart Grob Luft Und Raumfahrt GmbH & Co. v. E–Systems, Inc.*, 257 F.3d 461, 467–68 (5th Cir.2001) (holding trial court correctly determined that there was no evidence to prove lost profits with reasonable certainty under Texas law because of evidence of plaintiff's inexperience in building jet aircraft, its lack of a history of success, and lack of evidence that its bid would have been chosen over twelve others); *see also Miga v. Jensen*, 96 S.W.3d 207, 216–17 (Tex.2002) (stating that contract damages should not put plaintiff in a better position than if the contract had been honored by giving the plaintiff a risk-free investment); *Reardon v. LightPath Techs., Inc.*, 183 S.W.3d 429, 442 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (holding that plaintiffs' requested fraud damages were speculative and would provide them with the windfall of a riskless investment in a high-risk field). Therefore, we hold the trial court erred in denying the Ramco Parties' motion for judgment notwithstanding the verdict as to the award of lost-profits damages, and we sustain the Ramco Parties' third issue.

Because we have sustained the Ramco Parties' third issue and held that Plaintiffs are not entitled to any lost profits, and because lost profits were the only damages awarded to them, we hold that Plaintiffs cannot recover any attorney's fees, and we sustain the Ramco Parties' seventh issue to that extent.[32] *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex.1997) (holding no attorney's fees were recoverable under Chapter 38 of the Texas Civil Practice and Remedies Code as to party that did not recover any damages on its contract claim).

## B. The Ramco Parties' Entitlement to Summary Judgement on Plaintiffs' Tort Claims

In their second cross-issue, Plaintiffs contend that the trial court erred in granting summary judgment as to their claims for breach of fiduciary duty, misappropriation, and misappropriation of trade secrets.

In reviewing a traditional motion for summary judgment, we take as true all

---

**31.** Plaintiffs also point to testimony by Van Dyke that, even if he were unable to purchase any additional interest in Kazakhtenge or Tenge Development, the Ramco Parties' breaches still caused his company $200 million in damages based on his company's share of the $640 million dollars in lost profits calculated by Brickhill. In addition to being conclusory, Van Dyke's testimony in this regard relies on Brickhill's lost-profits calculations. Therefore, this testimony does not provide an independent basis to uphold the award of lost profits.

**32.** The only statute under which Plaintiffs sought attorney's fees is Chapter 38 of the Texas Civil Practice and Remedies Code.

evidence favorable to the non-movant, and we make all reasonable inferences in the non-movant's favor. *Dolcefino v. Randolph,* 19 S.W.3d 906, 916 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). If the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the non-movant to raise a genuine, material fact issue sufficient to defeat summary judgment. *Id.*

In reviewing a no-evidence motion for summary judgment, we ascertain whether the non-movant produced any evidence of probative force to raise a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Id.* We take as true all evidence favorable to the non-movant, and we make all reasonable inferences therefrom in the non-movant's favor. *Id.* A no-evidence motion for summary judgment must be granted if the party opposing the motion does not respond with competent summary-judgment evidence that raises a genuine issue of material fact. *Id.* at 917.

**Did the trial court err in granting summary judgment as to Plaintiffs' claims for breach of fiduciary duty, misappropriation, and misappropriation of trade secrets?**

The Ramco Parties filed two motions for summary judgment. One motion was filed jointly with all the other defendants then in the case, and the Ramco Parties filed another motion separately. In the order from which Plaintiffs appeal, the trial court granted summary judgment as to all of Plaintiffs' pending tort claims based on these two motions, which contained numerous traditional and no-evidence summary-judgment grounds. Because the trial court did not specify the grounds upon which it granted summary judgment in favor of the Ramco Parties,

Plaintiffs must show that each independent ground alleged in the motions for summary judgment is insufficient to support the judgment granted. *See Richardson v. Darlow,* No. 14–03–00830–CV, 2005 WL 283110, at *2 (Tex.App.-Houston [14th Dist.] Feb. 8, 2005, no pet.) (mem.op.). In the joint motion for summary judgment, the Ramco Parties asserted a traditional summary-judgment ground that the Ramco Parties did not cause Plaintiffs' alleged damages. The Ramco Parties argued that, under the undisputed evidence, parties not affiliated with the Ramco Parties—representatives of the Joint Enterprise and Plaintiffs' partners—legitimately had access to the same information that the Ramco Parties allegedly misappropriated, and these parties provided this information to Golden Eagle and Central Asia. The Ramco Parties also asserted that the undisputed evidence establishes that Plaintiffs lacked the financial resources to buy out the other interest owners in the Tenge Field and that these owners would not have sold to Plaintiffs even if Plaintiffs had possessed these resources. Although the Ramco Parties did not challenge causation with a no-evidence ground, this traditional ground attacking causation is an independent basis for summary judgment. Therefore, to effectively challenge the trial court's rulings on appeal, Plaintiffs must show, among other things, that this ground is insufficient to support the trial court's summary judgment. *See id.*

In their briefing on cross-appeal, Plaintiffs assert and argue that (1) the Ramco Parties' argument under *Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493 (Tex.1991) was not a valid basis for summary judgment; (2) the Ramco Parties owed Plaintiffs a fiduciary duty; and (3) Plaintiffs raised a genuine issue of material fact in response to the Ramco Parties' no-evidence grounds against Plaintiffs' claims for misappropriation and misappropriation of

trade secrets. At no point in this appeal, however, have Plaintiffs mentioned or addressed the traditional summary-judgment ground attacking causation. Plaintiffs have not presented an argument showing that this ground is insufficient to support the trial court's summary judgment. Though Plaintiffs assert that they raised a genuine issue of material fact as to the no-evidence summary-judgment grounds, the causation argument was a ground only in the traditional motion. Plaintiffs never mention causation in their argument, and they do not list it as an element of the misappropriation claims as part of their argument that they raised fact issues as to the no-evidence grounds. Furthermore, in their argument regarding alleged fact issues as to the misappropriation claims, Plaintiffs assert only that they raised fact issues regarding their possession and ownership of alleged trade secrets and the Ramco Parties' alleged unauthorized use of these secrets by transferring them to Golden Eagle. Because Plaintiffs have not asserted or shown that the traditional summary-judgment ground attacking causation is insufficient, we overrule the second cross-issue. See *Richardson*, 2005 WL 283110, at *2 (affirming summary judgment because party appealing therefrom did not argue and show that each of the independent grounds supporting the summary judgment was insufficient); *Humane Soc. of Dallas v. Dallas Morning News, L.P.*, 180 S.W.3d 921, 923 (Tex.App.-Dallas 2005, no pet.) (affirming summary judgment because party appealing therefrom did not challenge each of the independent grounds supporting the summary judgment and show that they were insufficient).

In addition, the trial court did not err in impliedly ruling that the Ramco Parties did not owe Plaintiffs a fiduciary duty. There is no evidence of any preexisting relationship between Plaintiffs and the Ramco Parties before the business transactions at issue in this lawsuit. To the extent Plaintiffs assert a fiduciary duty based on an informal relationship, this argument fails as a matter of law. See *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex.1997) (requiring preexisting relationship to impose fiduciary duty based on informal relationship in business setting). Plaintiffs contend that the Ramco Parties owed them a fiduciary duty based on the relationship between the parties created by the May 1997 Confidentiality Agreement and the November 1997 Letter of Intent. However, under the unambiguous language of these documents, no such fiduciary duty arises. Accordingly, the trial court correctly granted summary judgment in favor of the Ramco Parties as to Plaintiffs' claims for breach of fiduciary duty.

## V. CONCLUSION

The trial court did not err in granting summary judgment on Plaintiffs' claims for breach of fiduciary duty, misappropriation, and misappropriation of trade secrets. There is no evidence to prove with reasonable certainty what profits, if any, Plaintiffs lost as a result of the Ramco Parties' breaches of contract. Further, because Plaintiffs are not entitled to any actual damages, they are not entitled to attorney's fees. Therefore, the trial court should have granted the Ramco Parties' motion for judgment notwithstanding the verdict and rendered judgment that Plaintiffs take nothing as to the Ramco Parties. Having resolved the case on these issues, we need not reach the other issues raised in the appeal and cross-appeal. Accordingly, we reverse the trial court's judgment and render judgment that Plaintiffs take nothing against the Ramco Parties.